# CHARLESTON.

### SPILMAN v. CITY OF PARKERSBURG, et al.

Submitted September 7, 1891.—Decided December 19, 1891.

35 605
38 107
38 390

35 605
47 649

35 605
d50 441

35 605
d57 175

1. MUNICIPAL CORPORATIONS—DEBT.

A city, indebted up to the limit fixed by the constitution, can not carry on its operations upon credit, within the meaning of credit in the constitution, in any manner, or for any purpose, but must pay during the current year with funds in hand, or with funds already legally levied.

2. MUNICIPAL CORPORATIONS—DEBT.

A city thus indebted, can not increase its indebtedness beyond the constitutional limit by contracting for an electric apparatus and plant; and, such indebtedness being forbidden, the contract out of which it arises, although executory, is also forbidden. The end aimed at is prohibited, which carries with it the prohibition of the means, directly and appropriately designed and adapted for its accomplishment.

3. MUNICIPAL CORPORATIONS—INJUNCTIONS.

Any tax-paying resident and voter of such city, suing on behalf of himself and of all other tax-payers of such city has a right to enjoin the creation of any such unconstitutional indebtedness.

*J. B. Jackson* and *J. A. Hutchinson* for appellants, cited Code, c. 47, s. 28; 28 W. Va. 698; 23 W. Va. 672; 27 W. Va. 688; 30 W. Va. 439; Id. 496; 15 Wall 94; 15 How. (U. S.) 42; 103 U. S. 515; 93 U. S. 664; 102 U. S. 235; 29 W. Va. 362; 33 W. Va. 293; 2 Par. Cont. (7th Ed.) 643; 16 C. B. 420; 11 W. Va. 12; 98 Ill. 415; 49 Am. Rep. 416; 88 Ind. 473; 45 Am. Rep. 467; 105 Ill. 133; 17 Ia. 1; 26 Ia. 515; 36 Ia. 396; 28 N. E. Rep. 94; 97 Ind. 1; 26 N. E. Rep. 1074; 91 Pa. St. 398; 1 Dill. Mun. Corp. (4th Ed.) § 135; 49 Ia. 58; 144 Mass. 177; 26 Ill. App. 449; 58 Tex. 462; 15 Cal. 430; 16 Cal. 249; 27 Cal. 207; 87 Ill. 385; 31 Hun. 431.

*B. M. Ambler* for appellee, cited 102 U. S. 235; 7 W. Va. 501; 26 W. Va. 488; Lake Co. *v.* Rollins 130 U. S.; 28 N. E. Rep. 94, 95; 1 Dill. Mun. Corp. (last Ed.) 136 a.; 49 Ia. 58; 18 N. E. Rep. 781; 84 Ill. 626; 29 Cent. L. Journ. 347; 87 Ill. 385; 89 Ill. 282; 23 Ill. App. 449; 98 Ill. 15; 26 Ill. App. 449; 105 Ill. 138, 215; 114 U. S. 190; 18 N. E. Rep. 181; 21 N. E. Rep. 768; Acts 1872-3, c. 141.

HOLT, JUDGE:

Article 10 section 8, Constitution of West Virginia provides that "no county, city, school district, or municipal corporation, shall hereafter be allowed to become indebted, in any manner or for any purpose, to an amount, including existing indebtedness, in the aggregate exceeding five *per centum* on the value of the taxable property therein, to be ascertained by the last assessment for State and county taxes previous to the incurring of such indebtedness; nor without at the same time providing for the collection of a direct annual tax, sufficient to pay annually the interest on such debt and the principal thereof within, and not exceeding, thirty four years: provided, that no such debt shall be contracted under this section unless all questions connected with the same shall have been first submit-

ted to a vote of the people, and have received three fifths ot all the votes cast for and against the same."

This suit involves this provision of the State constitution, and is a bill in equity, filed in the Circuit Court of Wood county on the 9th day of April, 1891, by B. D. Spillman, who sues on behalf of himself and all other citizens, residents, and taxpayers in and of the city of Parkersburg, West Va., against the city of Parkersburg and others, to restrain and inhibit the creation by the city of a debt for the erection of an electric light plant, alleged to be in violation of the above mentioned section of the State constitution. The injunction was granted on May 25, 1891, until further order, and thereupon defendants gave notice of motion to be made on June 22, 1881, to dissolve, on which day the judge in vacation heard the motion, but overruled the same, refusing to dissolve the injunction, and from this order defendants below, plaintiffs in error, have obtained this appeal.

The facts are as follows: The total valuation of the taxable property on the 10th day of November, 1890, ascertained by the last assessment in the city for State and county taxes, was three million eight hundred and eighteen thousand, one hundred and twenty dollars—five *per cent.* of which is one hundred and ninety thousand, nine hundred and six dollars. The then existing indebtedness of the city was one hundred and ninety thousand dollars. On the 18th day of March, 1891, the Thomson-Houston Electric Company entered into a written contract of that date, whereby the Electric Company agreed to erect and install for the city a certain electric plant, in accordance with specifications attached and made part of the contract, for which the city agreed to provide a suitable site, boiler, and foundation for engine and dynamos, to pay all taxes on such apparatus and plant, and keep the same in repair, and also agreed to lease from the electric company such plant, furnished for street lighting for a term of five years from the completion of the plant, and to pay at the end of each three months after its completion—that is to say, quarterly —the sum of one thousand six hundred and twenty five dollars, for the use thereof, except that each succeeding pay-

ment was to be eighteen dollars and seventy five cents less than the preceding payment; and at the expiration of the term of five years the city has the right to buy the same at the price of $1—plainly a contract of purchase in legal effect; in fact so designated twice in a paper made part of the contract.

No question connected with this transaction was submitted to the people; no vote was had thereon. In addition there were in November, 1890, funds receivable from licenses, *etc.* the sum of seventeen thousand, four hundred and forty four dollars and fifty three cents.

## AGREEMENT.

"This agreement, made this 18th day of March, 1891, between the Thomson-Houston Electric Company, party of the first part, and the city of Parkersburg, W. Va., party of the second part, witnesseth : 1st. The party of the first part agrees to erect and install an electric light plant in accordance with specifications attached, such plant consisting of one 100 H. P. automatic cut-off and compound condensing engine of some well-known and approved make, such engine being guaranteed by the makers to have as high an efficiency as is attainable under the conditions of working ; two Thomson-Houston standard arc dynamos, each having a capacity of fifty (50) lamps of two thousand (2,000) nominal candle-power each ; seventy five (75) double carbon standard arc lamps, with necessary device for suspending over street; together with all other electrical apparatus and line construction to the extent of ten (10) miles single line, according to attached specifications, and necessary to make the plant complete and satisfactory in every detail. 2d. And the party of the second part agrees to provide a suitable site, building, boiler, and foundation for the above-mentioned engine and dynamos. 3d. And the party of the second part further agrees to lease from the party of the first part and operate such of the above-mentioned plant as is furnished by said party of the first part for street lighting, and is described in the attached specifications, for a term of five (5) years from the completion of said plant ; and the party of the second part agrees to pay party of the first part at the end of each

three months after the completion of said plant—that is to say, quarterly—the sum of sixteen hundred and twenty five dollars ($1,625) for the use of said apparatus and plant described in the attached specifications, except that each succeeding payment shall be eighteen dollars and seventy five cents ($18.75) less than the preceding payment. 4th. The party of the second part agrees to pay all taxes on said apparatus and plant furnished by party of the first part as described in the attached specifications, and to keep said apparatus and plant in repair. 5th. At any time during the term of lease above mentioned, and which the party of the second part hereby agrees to enter into, the party of the first part and the party of the second part agree that the party of the second part may purchase said apparatus and plant furnished by party of the first part by paying therefor to the party of the first part the difference between the sum of the amounts which may have been paid under the terms of the above-mentioned lease, and twenty five thousand dollars, to which shall be added the costs of any additions which, by mutual consent, may have been made, together with interest at six *per cent.* per annum from the completion of said plant to date of purchase. 6th. The party of the first part and the party of the second part agree that any additions and extensions which may be required shall be made to above-mentioned apparatus and plant by mutual agreement and consent. 7th. At the expiration of the term of the above-mentioned lease, and upon the completion and fulfillment of the terms and additions of same, party of the first part agrees that party of the second part may purchase the above-mentioned apparatus and plant as is described in attached specifications, together with any additions or extensions which may have been made in the manner as described above, for a consideration of one dollar, to which shall be added the cost of any such additions or extensions as may have been made, payable to the party of the first part. 8th. But if the party of the second part decides not to purchase as above provided for, then said party of the second part agrees to lease the above-mentioned apparatus and plant, together with any additions or extensions, for a further term of five

years, on terms to be agreed upon. The ordinances of the city of Parkersburg under which this contract is made and executed is hereby accepted by the Thomson-Houston Electric Company, and it and the specifications herein referred to are made parts hereof, as if the same were written herein. In witness whereof, the party of the first part has.caused these presents to be signed and its seal to be affixed by ——, its ——, and the party of the second part has caused these presents to be signed by G. B. Gibbons, its mayor, and its seal to be affixed and duly attested by L. W. Hughes, its clerk. G. B. GIBBONS, Mayor. [Seal.] Teste : L. W. HUGHES.   [Seal.]

## " SPECIFICATIONS.

### " *General Conditions.*

"Construction : It is understood that the Thomson-Houston Electric Co. is in no way responsible for any defects in wiring or other parts of the installation, unless the same is done under the direction of its authorized representative, or in any manner approved by it; and it is also understood that the entire installation is to be made in accordance with the requirements of the West· Virginia Board of Fire Underwriters.

" Right of Way : The purchaser is to provide right of way through the streets and alleys for the erection of pole lines, and also to obtain permission from private property owners to run wires over their property or premises where necessary, and no deley is to be caused the Thomson-Houston Electric Co. by reason of the purchaser not having obtained such concessions as will permit the Thomson-Houston Electric Co. to do promptly the work herein contemplated.

" Guaranty : The Thomson-Houston Electric Co. guaranties that the apparatus herein specified, when properly installed under its supervision, and operated in accordance with its instructions, will work in a practical and satisfactory manner ; and it is furthermore understood that, if power plant is furnished by purchaser, power is to be applied to pulley of dynamo, and it is to be of sufficient power, and so regulated, as to drive the dynamo at uniform speed, as specified by the Thomson-Houston Electric Co.

" Expert Service and Labor : The Thomson-Houston

Electric Co. will furnish a superintendent or expert to take charge of and superintend the entire work, said expert to remain, after the dynamo is started, for a period of thirty days for the purpose of instructing in the use of the apparatus.

"Any loss in time or expense caused the Thomson-Houston Electric Co. by failure to designate location of lamps, or in any other manner hindering completion, shall be paid for by the purchaser.

"Foundations: The city agrees to provide the foundations for the dynamos, of the dimensions as specified by the Thomson-Houston Electric Co.; said company, however, providing with the dynamos a proper base frame.

" *Arc Apparatus.*

"We propose to furnish:

"Dynamos: Two dynamos with a capacity of fifty arc lamps of two thousand nominal candle-power each.

"Automatic regulators: Two automatic regulators and controllers allowing extinguishment and relighting of lamps without attention to dynamo, and adjusting the output of the dynamo to the requirements of the line.

"Lamps: Seventy five double standard arc lamps of two thousand nominal candle-power each.

"Switch-board: Arc light switch-board of capacity to control four circuits, so arranged that any desired combination of dynamos and circuits may be readily made.

"Lightning arresters: Four lightning arresters, for protecting the dynamos from lightning discharges.

"Ammeters: One ammeter for measuring the current generated by the dynamo.

"Magneto bell: One magneto bell for testing circuits.

"The above to be delivered at Parkersburg, W. Va., by the Thomson-Houston Electric Co. and to be properly set up in the station, and made ready to be attached to the power by the Thomson-Houston Electric Co.

" *Arc Construction.*

"We propose to furnish:

"Lamp-hoods: Seventy five lamp-hoods for suspending lamps over center of street or from mast-arms.

"Mast-arms: Seventy five mast-arms, as follows: Mast-

arm to suspend lamp at least fifteen (15) feet from curb, and to be provided with means for raising and lowering lamp.

"Poles, cross-arms, and insulators: The Thomson-Houston Elec. Co. will furnish all poles, provided with necessary cross-arms, pins, and insulators, and erect the same ready for stringing the wire. Location and description of poles as follows: All necessary for stringing ten (10) miles single wire for location of lamps as desired. Poles to be straight, shaved, and sound, and at least thirty five (35) feet in length.

"Wire: The Thomson-Houston Elec. Co. will furnish and string upon the above-mentioned poles the wire necessary for the operation of seventy five lamps, the same to be of No. 6 B. and S. gauge, and of thorough water-proof insulation, all joints to be soldered and taped.

"Location of lamps: The Thomson-Houston Elec. Co. will install construction apparatus and seventy five lamps, and make necessary connections ready for putting lamps in operation.

"The attached sketch shows the general distribution of the lamps upon which the proposal is based. If any material change in location is desired, by which the cost is increased, such extra cost is to be paid by the purchaser.

"Steam plant: We propose to furnish:

"Boilers: Necessary boiler and fittings to be supplied by the city.

Engines: One engine of the McIntosh and Seymore manufacture and of the double expansion type; cylinders to be of —— inches diameter, and —— inches stroke, to develop one hundred H. P. at working revolutions and eighty steam pressure. Each engine to be furnished with two pulleys, of correct diameter, and of correct face. Each engine to be provided with cast-iron foundation box, foundation bolts and plates, full set of automatic oilers, sight-feed cylinder-cup, wrenches, and all other necessary fittings.

"Belting: Sufficient feet of leather belting, correct width, of first-class manufacture.

"Installation: The above is to be delivered at Parkersburg, W. Va., by the Thomson-Houston Elec. Co., and to

be set up with steam-pipe connections, ready to operate in connection with the electrical plant in the station by the Thomson-Houston Elec. Co., city to furnish necessary foundations."

Our leading case on this subject is *List* v. *City of Wheeling,* 7 W. Va. 501, decided in 1874, in which the opinion of the Court was delivered by Judge HAYMOND, a distinguished member of the constitutional convention of 1872. It was held that a court of equity in a proper case has jurisdiction to perpetually enjoin the creation of a debt prohibited by the constitution.

"The evident object of the section was to prevent a growing evil of the day, viz: The creation of large debts, the unnecessary and wasteful as well as fraudulent expenditure of the substance and earnings of the people, and unnecessary and oppressive taxation.

"It was not intended to and does not in any wise, interfere with or prevent the levying, collecting, and expenditure of taxes annually, by authority of law, by the proper legal authorities of the counties, cities *etc.*, * * * and to do and cause to be done whatever is necessary for that purpose, including the making and causing to be made contracts touching the *disbursement* of the taxes *levied* and collected annually and the like; and all this without a vote being taken under the 8th section of article X of the Constitution. * * * It was intended to prevent the county authorities, city authorities *etc.*, respectively, from creating debts against the counties, cities *etc.* without the assent of three fifths of the voters of the county, city *etc.*, voting upon the question as to whether the debt should be created, and then not exceeding the limit prescribed in the section." Id. 523. See, also, opinions of BRANNON, J., in *Brannon* v. *County Court,* 33 W. Va. 789 (11 S. E. Rep. 34) and in *County Court* v. *Boreman* (W. Va.) 12 S. E. Rep. 490.

The county, with us, and not the town in any sense, is the unit of subordinate local government, yet towns are growing in number, size, wealth and population; and, in anticipation of this, the constitution of 1872 provides that the legislature shall provide by general laws for the incorporation of cities, towns and villages. Art. VI, § 39 Const.

Such provision has been made. Chapter 47 Code, (Ed. 1891) p. 421. The charter of the city of Parkersburg is contained in the Act of 1887, c. 26. The constitution was adopted by the people on the 22nd day of August, 1872. "Such limitations have been found by experience to be necessary to prevent extravagance, are remedial in their nature, are based on the wise policy of paying as you go, and ought, therefore, to be construed and applied to secure the end sought." 1 Dill Mun. Corp. (4th Ed.) section 130. It was intended by the people as a precaution against injudicious action on their own part, and commended itself to their hearty approval. The State of Iowa took the lead in this matter. See Const. of Iowa, 1857, Art. XI, s. 3. Illinois followed in her constitution of 1870. Ours was modeled after that of Illinois.

Many other States now have similar constitutional provisions, and the people, in the adoption of constitutions of the new States, and amendment of constitutions of the older ones, have often had the question presented to them. Quite a number of decisions have been made in applying this provision in given cases. See reference to many of them in 15 Am. & Eng. Ency. Law p. 1122, *et seq.* and notes; 1 Dill. Mun. Corp. (4th Ed.) §§ 130–138, 527, 528 a.

Section 8, of article X of the West Virginia constitution, is evidently intended to cut up by the roots the power of the city to become improperly indebted, for it is aimed against all such debts, no matter how they may be created or for what purpose. Blackstone (Vol. 3, p. 154) says: The legal acceptation of debt is a sum of money due by certain and express agreement." This is given in connection with his treatment of the action of debt.

In the constitution it means any debt created by contract, express or implied; any voluntary incurring of any liability to pay in any manner or for any purpose, when the given limit of indebtedness has been reached. It may be a debt payable in the future as well as one payable presently; one payable upon some contingency, such as the delivery of property as well as for property already delivered.

When the contingency happens, the debt becomes fixed; it exists. It only differs from an unqualified promise in

the *manner in* which it is created. And, since the purpose of the debt is expressly excluded from consideration, it can make no difference whether the debt be for necessary current expenses or for something else."

I do not deem it necessary to review *seriatim* the many cases on the subject, but rather, with their help, make a careful analysis of our own Constitutional provision on the point.

1. What kind of indebtedness is prohibited? " If a man have any more or less of meaning in the term he makes use of than another, he does not talk with him to the same point." By the term "indebtedness" as here used, is meant the state of being by voluntary obligation, express or implied, under legal liability to pay in the present or at some future time for something already received, or for something yet to be furnished or rendered. This includes every kind of indebtedness, no matter in what manner created, or voluntarily brought about; or for what purpose, whether it be for municipal self preservation or not; whether for pure air, pure water, good light, clean and convenient and safe streets and sidewalks ; whether it be payable now or hereafter, payable quarterly or annually, or at any date running on for thirty four years ; whether for current expenses, or fixed and definite debts or charges; whether for personal property or real property, leasehold or freehold ; it is none the less indebtedness, created in some manner and for some purpose, and is within the purview and the bar of the Constitution.

The confusion as to "current expenses" grows out of the failure to give due weight to another part of section 8, Art. X.

2. Provision for payment. The city shall "at the same time provide for the collection of a direct annual tax sufficient to pay annually the interest on such debt, and the principal thereof within and not exceeding thirty four years." If it is an item of current expenses or anything else for the payment of which provision has *already* been made by levy laid, then it needs no other provision for its payment, and is not within the letter of the Constitution ; neither is it within its true meaning, for a draft on a fund already in

hand or by levy already made and provided, meets it and discharges it, so that no indebtedness arises.

Thus it happens that the mere coincidence of current expenses being generally met and discharged by a fund in hand or already levied for is apt to mislead us into the view that indebtedness to pay current annual expenses is not within the prohibition ; whereas, as we have seen, it is as absolutely prohibited as indebtedness created in any other manner or for any other purpose.   This clause of the section is for the benefit of the creditor.

3.  " Shall not hereafter be allowed to become indebted in any manner or for any purpose to an amount, including existing indebtedness, in the aggregate exceeding five *per centum* on the value of the taxable property therein, to be ascertained by the last assessment for State and county taxes previous to the incurring of such indebtedness." This provision is intended, ·by fixing a maximum limit in any and all events, to guard the people of the town from their own thoughtlessness or recklessness as to the burden put upon themselves and others, the large tax-payers being generally in the minority.   It is intended to protect posterity by its limit as to time, and the tax-payers by its limit as to quantity.

4.  " Not exceeding five *per centum* of the value of the taxable property therein, to be ascertained by the last assessment for State and county taxes previous to the incurring of such indebtedness."   This gives us a precise and definite standard by which to measure and ascertain, the extent to which the indebtedness may go, and we see it does not include tithables, nor license, nor market fees, nor wharfage, nor police court fines, nor bridge tax, &c.

5.  " Provided that no debt shall be contracted under this section, unless all questions connected with the same, shall have been submitted to a vote of the people, and have received three fifths of all the votes cast for and against the same," plainly intending that no such indebtedness should be created in a corner, and without the knowledge and sanction of the taxpaying voters.   It should be public, and run the gauntlet of full and free discussion·

The people must be in earnest about this matter, or they

would not by their organic law have barred out this debt creating power with a triple hedge of safeguards.

Its wisdom is unquestioned, and it has found or is rapidly finding its way into all State constitutions. It is plainly remedial; therefore the courts should uphold it with a steady hand, and construe and apply it in the advancement of the benefit sought for, and in suppression of the evil intended to be suppressed, and not give up the citadel to the first hard case, with bad law in its train, that demands its surrender.

When we apply this section, thus read and construed, to the facts of the case in hand, we find this electric contract unable to penetrate even the outer wall.

1. What matters it what we call the thing contracted for, or the contract itself, lease, purchase, or executory contract to lease or purchase; the thing thus created is a debt. It is executory; it may never be carried out. None the less it is a present binding agreement for the creation of a prospective debt.

2. The five *per cent.* limit was already reached—it may lack a trifle, but virtually reached. The maximum measure is full. There is room for no more indebtedness.

We are not permitted to piece on to the last aggregate tax value, the seventeen or twenty thousand dollars derived from city licenses, police fines *etc.*, in order to broaden the five *per cent.* fund, by enlarging the basis from which it is calculated, so as to make room for another debt. The constitution does not say so, but by what it does say excludes it. Why not take this fund, and buy the electric apparatus? Then there would be no debt.

Not being capable of being used to enlarge the basis of calculation at the one end, neither can it be used to belittle the debt at the other, to make it insignificant, compared with the means of payment. To say that it is sufficient to pay with will not do, it must be applied; and, when that is done, the dispute is ended.

3. The people have had no say in the matter, they have not voted, nor had an opportunity to vote.

The right of the city to create indebtedness is exhausted. The indebtedness amounts to one hundred and ninety thous-

and dollars, the maximum limit is one hundred and ninety thousand eight hundred and fifty dollars and fifty cents— leaving the margin of eight hundred and fifty dollars and fifty cents.

4. On behalf of the city authorities it is urged with a good deal of force that this is a contract for light, one of the public necessities of city life; that to provide it, is one of the urgent items of current expense; that a modern plant can not be obtained by yearly contract; that it is so costly, that no one will take the risk of supplying it in that way, but that the only obtainable terms are for a term of years, say five at the least, with quarterly or annual payments; and that, as the rent or installments of purchase-money fall due, only as the compensation has been earned, the funds are by that time in the treasury with which to pay. All this sounds plausible enough, but the trouble with it is, no levy has been made to meet it; no provision has been made or can be made for a direct annual tax sufficient to pay it, because the indebtedness already existing is up to the maximum allowed by law, and the contract does not restrict its source of payment to current funds derivable from sources other than taxation, such as licenses, polices fines etc., if that would avoid the trouble (as to which we express no opinion.)

That may be one of the sources of revenue already set apart or relied on to pay interest and principal of the one hundred and ninety thousand dollars of city indebtedness already existing.

The city is rapidly increasing in taxable wealth, no doubt, but the constitution requires us to take as the basis the last assessment, and that is before us among the facts of the case, and we are not allowed to look ahead to some conjectural assessment not yet made.

I have examined all these cases of "necessary current expenses," as they are called, to which our attention has been directed; examined some of them in a perfunctory manner, it is true for no man nowadays can deliberately read everything. *City of East St. Louis* v. *Gas Light Co.*, 98 Ill. 415.

*City of Valparaiso* v. *Gardner*, 97 Ind. 1; *Sackett* v. *City of New Albany*, 88 Ind. 473; *Coy* v. *City Council*, 17 Iowa 1;

*Coffin* v. *City Council*, 26 Iowa 515; *Grant* v. *City of Davenport*, 36 Iowa 396; *Crowder* v. *Sullivan*, (Ind. Sup.) 28 N. E. Rep. 94; *City of New Albany* v. *McCulloch* (Ind. Sup.) 26 N. E. Rep. 1074; *Appeal of City of Erie*, 91 Pa. St. 398; *Water Works* v. *Woodward*, 49 Iowa 58; *Smith* v. *Dedham*, 144 Mass. 177 (101 S. E. Rep. 782); *East St. Louis* v. *Flannigan*, 26 Ill. App. 449; *Potter* v. *Douglas, Co.*, 87 Mo. 239; *Grant Co.* v. *Lake Co.*, 17 Or. 453 (21 Pac. Rep. 477); *Dively* v. *Cedar Falls*, 27 Iowa 227; *Corpus Christi* v. *Woressner*, 58 Tex. 462; *State* v. *McCauley*, 15 Cal. 430; *Koppkins* v. *Com'rs.*, 16 Cal. 249; *People* v. *Pacheco* 27 Cal. 207; *Law* v. *People*, 87 Ill. 385; *Water Co.* v. *Utica*, 31 Hun. 9 431; *Railway Co.* v. *City of Jacksonville*, 114 Ill. 567; *Laycock* v. *Baton Rougz*, 35 La. Ann. 475; *Association* v. *City of New Orleans*, 33 La. Ann. 571. I need not stop to compare and distinguish, that has been well done in 1 Dill. Mun. Corp. (4th Ed.) § 133, *et seq.* and notes. And I have been led to the conclusion that the safe and sound construction is laid down in the much-considered case (three times before the court) of *Prince* v. *City of Quincy*, 128 Ill. 443, 1889, (21 N. E. Rep. 768). "The effect of this constitutional inhibition is to require cities indebted to the limit fixed by the constitution to carry on their corporate operations while so indebted upon the cash system and not upon credit to any extent or for any purpose;" that is, payment must be provided for by levy laid, as distinguished from levy hereafter intended to be laid.

"If an indebtedness of a city for current expenses and supplying water is forbidden, as being in excess of the constitutional limit, the contract upon which it arose, though in itself executory and creating only a contingent liability, is also forbidden. Prohibition of the end is prohibition of the direct, designed and appropriated means."

This is the true construction. Any other would deprive these constitutional limitations of the force and efficiency indispensibly required, to prevent or cure the evil aimed at.

To this conclusion the learned judge of the Circuit Court who entered the order complained of was brought, no doubt, after a careful consideration of the authorities. I regard his conclusion as the only safe and sound one. We

are working in constitutional harness in the piping times of peace, and do not feel called on to heed the exacting imperiousness of these higher laws of municipal self preservation ; but are forced to say what he has in effect said, "the city fathers when the constitutional limit of voluntary indebtedness, as in this case, has been reached, must for the time cast about in search of the philosopher's stone 'pay as you go.'"

Therefore the order of the Circuit Court of Wood county, entered by the judge in vacation on the 22nd day of June, 1891, overruling defendant's motion to dissolve the injunction awarded on the 25th day of May, 1891, is affirmed.

AFFIRMED.