OF

## THE STATE OF IOWA

AT

## DES MOINES, JANUARY TERM, A. D. 1900.

AND IN THE FIFTY-FOURTH YEAR OF THE STATE.

---

JAMES H. WINDSOR v. THE CITY OF DES MOINES, THE McCASKEY & HOLCOMB COMPANY, H. C. MURPHY, Treasurer of Polk County, *et al.,* Appellants.

**Constitutional Law:** MUNICIPAL DEBTS: *City and county.* Constitution, Article 11, section 3, which prohibits a city from incurring an aggregate indebtedness exceeding five per cent. on the value of the taxable property within such city, "to be ascertained by the last state and county tax list," does not limit the indebtedness of such city to five per cent. of the property subject to taxation for city purposes, where the state and county tax lists include all property in the corporate limits, whether taxable for city purposes or not.

NECESSITY NO DEFENSE. The necessity for an electric light plant constitutes no excuse or justification for the construction of such plant by a city, where such construction would increase the city's indebtedness beyond the constitutional limitation, imposed by Constitution, Article 11, section 3, which declares that a city's

(175)

indebtedness shall not exceed five per cent. on the value of its taxable property.

*Nor that contract is advantageous.* The fact that a city did not by entering into a contract for the construction and maintenance of an electric light plant, obligate itself to pay more than it had theretofore been paying for lighting alone, is no justification for its entering into such contract in violation of Constitution, Article 11, section 3, which prohibits a city from incurring a debt greater than five per cent. on the value of its property subject to taxation.

WHAT IS "DEBT." Where it is entirely optional with a city whether it should pay anything further on a contract, such contract does not create a debt, to be considered in determining whether the city has exceeded its constitutional indebtedness.

*Same.* A city's failure to show that certain contract liabilities were to be paid out of its current revenues does not operate to sustain its claim that, because such facts were not shown, such obligations were not to be considered in figuring the aggregate indebtedness of such city.

*Same.* Where a city, to provide for the payment of the consideration of a contract, agreed to issue warrants, and to levy a tax for their payment, and also pledged its future revenues therefore, it created an indebtedness coming within the inhibition of Constitution, Article 11, section 3, which declares that a city's indebtedness shall not exceed five per cent. on the value of its taxable property.

*Same.* Sums becoming due from a city under a contract for the erection of an electric light plant, time of payment of which has been postponed to a later date, and no special levy for the purpose of erecting same having been authorized, must be taken into account in estimating the amount of the existing indebtedness of such city·

*Express and implied promises.* Constitution, Article 11, section 3, which provides that no city shall be allowed to become indebted in any manner for any purpose to an amount, including existing indebtedness, in the aggregate exceeding five per cent. on the value of its taxable property, applies to implied, as well as express, promises creating such indebtedness.

**Electric light Plant:** SPECIAL ASSESSMENT: *Anticipation of revenue.* It does not follow, that, because the city had the right to levy a special assessment for the purpose of maintaining and operating an electric light plant, it could anticipate its future general revenues for the purpose of erecting such a plant.

**Curative Acts:** AS A DEFENSE. A curative act, passed after the commencement of an action disputing the legality of certain proceedings, which afterwards were cured by the passage of such an act, is a defense to the action.

CONSTRUCTION: *Preamble, enacting clause and body.* A curative act, the preamble of which refers to certain specified defects, but the body of which declares that a certain contract with a city for the construction of an electric light plant, and the operation and
2  maintenance thereof, "is hereby legalized   *   *   *   as fully as though all the requirements of the law leading up to and necessary thereto had been followed in every respect and particular, and on full compliance with the law," operates to cure all defects in the preliminary proceedings incident to the making of the contract, but does not, necessarily, render the contract itself valid.

*Appeal from Polk District Court.*—HON. CHARLES A. BISHOP, Judge.

TUESDAY, JANUARY 16, 1900.

AUGUST 3, 1897, the city of Des Moines entered into two separate contracts,—one with the McCaskey & Holcomb Company, for the construction of an electric light plant, to be owned by the city, and for its operation by the company for the term of two years; the other with the trustees of what is known as the "Sibley Estate," for the purchase of several lots on which to erect the electric light plant. After the contracts were entered into, but before anything was done thereunder, plaintiff commenced this suit in equity, asking a decree canceling said contracts, and assailing the validity of a tax levied, after the making of the contracts, for the purpose of meeting the obligations imposed thereby. Plaintiff claims that the contracts were and are illegal, because not authorized by vote of the people of the municipality, and because they created an indebtedness in excess of the constitutional limit. The trial court sustained the plaintiff's contention, and defendants appeal.—*Affirmed.*

*I. M. Earle* and *J. Edward Mershon,* for appellants.

*Cummins, Hewitt & Wright* and *Connor & Weaver,* for appellee.

DEEMER, J.—Prior to the year A. D. 1897, there had been in operation in the city of Des Moines three private

electric light plants. In the early part of that year the city authorities concluded, however, to construct a fourth one at public expense. Pursuant to this purpose, the board of public works of the city published proposals for the construction of such works. In response to these proposals, the McCaskey & Holcomb Company submitted three separate bids or propositions for the erection of a plant. Shortly after the submission of these bids, the mayor of the city issued a proclamation for a special election, and fixed the seventeenth day of May, 1897, as the time for holding it. The following is a copy of the form of ballot used at that election:

"Shall the following proposition be adopted: *First.* Shall the city council of the city of Des Moines, Iowa, authorize the McCaskey & Holcomb Company to construct an electric light plant, and erect the necessary wire and apparatus to furnish light to the city and its streets?

☐ For electric light plant.

☐ Against electric light plant.

"Shall the following proposition be adopted: *Second.* Shall an electric light plant, with necessary wires and apparatus, be established by the city of Des Moines.

☐ For electric light plant.

☐ Against electric light plant."

At the election, 3,756 votes were cast in favor of the electric light plant on both propositions, and 1,300 were registered in the negative. Only 31 votes were cast for the first proposition alone, and none for the second. The trial court held in favor of the plaintiff's contention that these propositions were inconsistent and contradictory, and that, if this be not true, the city council was authorized to do either the one or the other of the two things authorized; thus leaving it to that body to do as it pleased, and grant a franchise or not, as it saw fit. The trial court also held, in effect, that the bids made by the McCaskey

Company did not correspond with the published proposals. For these reasons it entered a decree for plaintiff, adjudging the election, and the contracts entered into pursuant thereto, void, and annulled the tax ordered for the purpose of meeting the obligations created by the contracts. After the decree had been entered, the legislature passed a curative act, which will be hereinafter more particularly referred to. After that act was passed, defendants asked for a vacation and modification of the decree. This request was denied, but defendants were given leave to file a petition to set aside and modify the decree, if they were so advised. Defendants now rely on this curative act as a defense to plaintiff's claims that the proposal for bids and the bids of the McCaskey Company, and the proposition submitted to the electors at the special election, did not conform with law; while plaintiff contends that the curative act cannot be considered on this appeal, that, if considered, it did not cover all the defects in the proceedings leading up to the contracts sought to be annulled, and that, in any event, the invalidity of the contract for the purchase of land and of the tax levied to pay for the operation of the plant was not affected.

The first question for solution relates to the validity and scope of the act, and its effect on pending litigation. "A curative act may cure or legalize any act which the general assembly could, as an original question, have authorized." *Huff v. Cook,* 44 Iowa, 641; *City of Clinton v. Walliker,* 98 Iowa, 655, and cases cited. And a large discretion is vested with the legislature in determining when such special laws should be passed. *Chicago, R. I. & P. Ry. Co. v. Independent Dist. of Avoca,* 99 Iowa, 556. It is no objection to such legislation that it was passed after action is commenced disputing the validity of the act. As a rule, every case must be determined on the law as it stands at the time judgment is pronounced. Of course, the legislature cannot impair the obligation of contracts, nor by subsequent legislation disturb vested rights. But the bringing of suit

vests no right in a particular decision. *Huff v. Cook,* 44
Iowa, 639. This is a suit in equity, and is triable *de novo*
in this court. Until final decree is passed, there is no vested
right to be disturbed, and the case must be determined on the
law as it now stands. These are elementary propositions,
supported by the following, among other, authorities. *Land
Co. v. Soper,* 39 Iowa, 112; *Huff v. Cook, supra; Association
v. Heidt,* 107 Iowa, 297 (43 L. R. A. 689); *Same v. Curtis,*
107 Iowa, 504.

But it is argued that the curative act does not cover all
the defects in the proceedings, and that the contract should
be annulled because of certain defects not mentioned in the
curative act. While the preamble refers to
certain specified defects, yet the act itself
says that the contract made with the McCaskey
& Holcomb Company, for the construction of the elec-
tric light plant, and the operation and maintenance
thereof, "is hereby legalized * * * as fully as though
all the requirements of the law leading up to, and necessary
thereto, had been followed in every respect and particular,
and on full compliance with the law." See Acts Twenty-
seventh General Assembly, chapter 184. While the preamble
may be considered in arriving at the legislative intent, yet
if, in reading the enacting part, there is no ambiguity or
doubt as to its scope or meaning, there should be no recourse
either to the title or to the preamble in order to discover a
different meaning. Sutherland Statutory Construction, sec-
tion 212, and cases cited. As a general rule, the preamble
may extend, but cannot restrain, the effect of the enacting
clause. Sutherland Statutory Construction, section 213. It
is clear, we think, that all defects in the preliminary proceed-
ings incident to the making of the contract were cured by the
act hitherto quoted.

But it does not follow that the contract is valid. Attack
is made on it because it created a debt in excess of the consti-

tutional limitation.   That limitation is in these words  "No
county or other political or municipal corporation shall be
allowed to become indebted in any manner or for any pur-
pose to an amount in the aggregate exceeding five per centum
on the value of the taxable property within such county or
corporation to be ascertained by the last state and county
tax lists previous to the incurring of such indebtedness."

Constitution, article 11, section 3.   The assessed valu-
ation of the taxable property within the corporate
limits of the city of Des Moines, as shown by the
state and county tax lists of the year 1896, was sixteen mil-
lion four hundred and seventy-five thousand two hundred
and sixty dollars.   The authorized debt was therefore eight
hundred and twenty-three thousand seven hundred and sixty-
three dollars.   Plaintiff contends that the indebtedness is
limited to 5 per centum of the property subject to taxation
for city purposes.   We cannot agree with him in this con-
tention.   The state and county tax lists include all property
in the corporate limits, whether taxable for city purposes or
not.   *Todd v. City of Laurens,* 48 S. C. 395 (26 S. E. Rep.
682).   At the time the contract in question was entered into,
the bonded debt of the city was seven hundred and sixty-
nine thousand dollars.   It was indebted on outstanding war-
rants in the sum of eighty-five thousand two hundred and
seventy-three dollars and seven cents.   It had in cash on
hand, belonging to eight or ten different funds, sixty-eight
thousand one hundred and twelve dollars and seventy cents.
Taking from this last amount special funds which could not
be used for the payment of outstanding warrants, and we
find but forty-seven thousand seven hundred and twenty-nine
dollars and twenty-eight cents in available cash on hand.   The
officers testify, however, that no warrants were drawn, unless
there was an appropriation to meet them, and that as soon
as the appropriation was exhausted no more warrants were
drawn.   As this evidence is uncontradicted, we must accept

it as true, and, if true, it eliminates the outstanding warrants. The city had also entered into a contract to purchase a new cemetery, in which it had the right to acquire title to a tract of land for cemetery purposes on payment of the sum of thirty-five thousand dollars, four thousand dollars of which amount was paid, and the city had the option to quit paying at any time, and to take title to such of the property as it had in fact paid for. Whether or not it should pay anything further on this contract was entirely optional with the city, and we do not think it should be treated as creating a debt. *Burnham v. City of Milwaukee*, 98 Wis. 128 (73 N. W. Rep. 1018). But it also appears that there were judgments against the city which were unpaid on August 3, 1897, amounting to something over fourteen thousand six hundred and ninety-two dollars. In addition to this, the city had also entered into a bridge contract providing for the grading of approaches to what is known as the "Fifth Street Bridge" at an expense of nineteen thousand one hundred dollars, and had also entered into various grading contracts imposing liabilities on the city amounting to something over thirteen thousand dollars. It is contended by appellants that these contract liabilities should not be considered, for the reason there is nothing to show that they were not to be paid from the current revenues of the city as the work progressed. We think it fairly appears that these contracts created debts on the part of the city, and there is no showing that the amounts earned thereunder could be paid out of the current revenues. The burden is on the city to establish the claim made by it, and this it has failed to do. *City of Council Bluffs v. Stewart*, 51 Iowa, 385. Indeed, as we understand it, the evidence shows that current revenues were absorbed by the warrants theretofore issued and the current expenses of the city. The amount of indebtedness against the city at the time the contracts in question were entered into was about eight hundred and sixteen thousand dollars, and to this should be

added about nine thousand dollars in accrued interest on the bonded indebtedness, making a total of about eight hundred and twenty-five thousand dollars. This is a fair and liberal estimate, and in arriving at it we have given the city the benefit of every doubt respecting the character of the indebtedness. There is no doubt in our minds that the city was indebted to the full constitutional limit at the time it made the contracts in question.

The remaining inquiry is, did those contracts create a debt such as is inhibited by the constitutional provision? This involves the consideration of a long and carefully worded instrument, drawn for the evident purpose of meeting the constitutional objection. By the terms of the contract with the McCaskey Company, that company agreed to furnish the materials for and to construct an electric light plant, according to certain plans and specifications, to be completed and ready for occupancy on or before January 1, 1898. The plant was then to be accepted and approved by the city, and a payment of sixty thousand dollars made on account of the construction thereof. The contractor was to operate the plant for the first year, and furnish certain lights to the city, and at the end of the year, if the plant had been operated according to agreement, it was to receive a further payment of twenty-five thousand dollars on account of the construction, and monthly during the year for lights furnished the sum of two thousand seven hundred and eight dollars and thirty-three cents. The contractor was also to operate the plant during the second year, and to receive at the end of that year twenty-four thousand dollars on account of construction, and the same monthly payments as during the first year. An option in the contract makes provision by which it was possible for the contractor to operate the plant for thirteen additional years. The provision as to payment reads as follows: "The company is to receive in full payment for the construction of said plant as provided in the specifications, and for operating and keeping the same in

repair for the period of two years hereinbefore provided, the following sums to be paid, however, only in the manner and from the funds hereinafter specified: Upon completion and acceptance of plant, sixty thousand dollars; one year after completion and acceptance of plant, twenty-five thousand dollars; two years after completion and acceptance of plant, twenty-four thousand dollars, annually for each of two years the sum of thirty-two thousand five hundred dollars, payable in equal monthly installments." It is immediately thereafter recited that "the payment of twenty-five thousand dollars shall not be considered as earned, accrued, and payable unless and until the company also during said year shall operate said plant, and keep the same in repair, as hereinbefore provided." There is a similar provision respecting the payment of twenty-four thousand dollars to be made at the end of the second year. The city further agrees "that, at the proper time, it will duly levy, as a part of its authorized current revenues provided for by sections 675 and 676, McClain's Code, for the year 1898, a tax upon the assessable property in said city sufficient to produce the said sum of sixty thousand dollars, and that it will at the proper time duly appropriate from its said revenue the said sum of sixty thousand dollars, and cause the same to be paid as collected to the company, upon the completion and acceptance of the said plant, or, if the said sum has not been collected, to cause to be duly executed and delivered to the said company its warrants in proper form, drawn on said fund so appropriated, for the said sum of sixty thousand dollars, or any balance thereof not paid in money; the object and purpose thereof being to levy, anticipate, pledge, and appropriate from the current revenues of the city for the year in which said plant is completed the said sum of sixty thousand dollars as the first payment thereon." In general terms, a similar provision is made for the two payments of twenty-five thousand dollars and twenty-four thousand dollars. Then follows an obligation on the part of the city to make the special assess-

ment which it is claimed may be made for maintaining and operating an electric light plant, under sections 473, 474 and 475 of the Code as amended, to provide a fund for the payment of two thousand seven hundred and eight dollars and thirty-three cents per month to be paid for light, after which the city undertakes the following general obligation: "And the said city hereby agrees and obligates itself to do any and all things proper and necessary to the due levy of such contemplated taxes, and to duly appropriate from such general and special funds the said sums to be paid as herein stated, and to draw such warrants in anticipation of the actual collection thereof as hereinbefore specified, and the city hereby agrees to make such levy and appropriation, set apart and pledge such specified revenues to said extent for said purposes, and to use all due effort to collect and pay the same to the company; but it is hereby agreed that no general indebtedness for the payment of the specified sums is hereby created against the said city, but only the obligation to levy, anticipate, and pledge its current revenues, general or special, as and for the purpose hereinbefore stated. It is hereby agreed, also, that the city may, at its election, at any time, pay all or part of such deferred payments out of money on hand legally available for that purpose, and shall be entitled to receive upon such payments a discount of six per cent. from the time it is so made until the time when it becomes payable, as hereinbefore provided, and shall thereupon be discharged *pro tanto* from the obligation to levy, assess, and collect said amount as an appropriation of its current revenues as above specified." Then follows this provision, pledging or mortgaging the property as security for the fulfillment of the promises made by the city: "And it is further agreed that, in so far as it has power so to do, the city does hereby pledge and mortgage to the company the entire plant to be constructed as described in the specifications hereto attached, with all appurtenances, and including also the tract of land whereon the power station of said

plant is to be erected, to-wit, lots 1 to 8, inclusive, Sibley's addition to the city of Des Moines, Iowa, to secure the full performance by the city of its covenants in this contract; the object and purpose of this clause being to give the company, in so far as the city has power to do so, a lien upon the said plant and premises to secure the said company the performance as aforesaid, on the part of the city, of the covenants of this contract by it entered into. And the said mortgage shall be foreclosable in the ordinary manner upon failure of the city to perform any of the covenants of the contract upon its part, after sixty days' notice in writing of the particular default has been given to the city by the said company, unless such default be rendered within said sixty days." This is followed by a stipulation as to operation and repairs, as follows: "The company shall at once, upon the completion and acceptance of said plant in the manner provided in the specifications, be placed in possession of the entire plant, and shall during the said term of years, at its own expense, furnish and put in place on said plant all repairs necessary for its proper maintenance and operation, except such as may be necessary by reason of unavoidable casualty, as hereinafter specified; * * * provided, however, that, in case of unavoidable casualty by cyclone, tornado, fire, etc., totally or partially disabling the said plant, the city shall, at its own expense, place the same in its former condition at the earliest period at which the same can be done, by the use of due diligence, and shall carry fire insurance upon the said plant to the extent of no less than twenty thousand dollars, and tornado insurance to an extent of not less than fifty thousand dollars." The last clause of the contract reads as follows: "It is further agreed that, in case either party shall at any time be prevented or delayed by legal process from performing any of the covenants hereby undertaken on its part, and this contract is subsequently finally held valid, and such process vacated and dissolved, or suits assaulting its validity finally

defeated or dismissed, such party shall at once thereupon proceed to perform all the conditions and covenants by it undertaken herein as nearly as possible as to time, in substantial conformance with, and in all other respects in full compliance with, this contract." We have now set out all parts of the contract material to the determination of the questions before us, and proceed to a discussion of these questions.

In *Mosher v. School Dist.* 44 Iowa, 122, we said: "It will be observed that article 11, section 3, of the constitution provides that the corporation shall not become indebted *in any manner* or for any purpose to an amount in the aggregate exceeding 5 per centum of the value of its taxable property. This prohibits an indebtedness in the form of bond, note, or any other kind of obligation, whether it be in writing or by parol, express or implied." As said by Justice Miller in *City of Litchfield v. Ballou,* 114 U. S. 192 (5 Sup. Ct. Rep. 821, 29 L. Ed. 133), construing the constitutional provision before quoted: "But there is no more reason for a recovery on the implied contract to repay the money than on the express contract found in the bonds." The language of the constitution is that no city, etc., shall be allowed to become indebted in any manner or for any purpose to an amount, including existing indebtedness, in the aggregate exceeding five per centum on the value of its taxable property. It shall not become indebted,—shall not incur any pecuniary liability. It shall not do this in any manner; neither by bonds, nor notes, nor by express or implied promises. Nor shall it be done for any purpose, no matter how urgent, how useful, how unanimous the wish. There stands the existing indebtedness to a given amount in relation to the sources of payment as an impassable obstacle to the creation of any further debt, in any manner or for any purpose whatever. If this prohibition is worth anything, it is as effectual against the implied as the express promise, and it

is as binding in a court of chancery as a court of law. In *McPherson v. Foster*, 43 Iowa, 48, we find this significant language: "The constitutional provision in question, it will be observed, prohibits the creation of indebtedness beyond the prescribed limit. It is an inhibition upon such indebtedness, however its creation may be attempted. It will cover the case of implied contract, as well as express contract by bond or otherwise. It is aimed at the indebtedness, not its form. It cannot be true, then, that a debt could be created because a consideration is received."

That the contracts in question created obligations on the part of the city there can be no doubt. It agreed to issue warrants, to levy a tax for the payment of the same, and also pledged its future revenues to the payment of these warrants. Had it issued the warrants, and failed to levy the tax, there is no doubt that the holder could have enforced them against the city. *Clark v. City of Des Moines*, 19 Iowa, 199. At the time the McCaskey contract was entered into, there was no statute authorizing a special levy for the purpose of constructing electric light plants, and the warrants, when issued, could only be paid out of the general funds.

But it is said that the city may anticipate its revenues, and that in so doing it is not violating the constitutional provision, and reliance is placed on some language found in *Dively v. City of Cedar Falls*, 27 Iowa, 227, wherein it is said: "If A. should undertake to build a court house within three years, doing so much, and to be paid accordingly, each year, the obligation of the contract would arise when executed, but the indebtedness, under the constitution (if there was none other), would be measured by that to be paid each year. If this is not so, then it would be impossible in a majority of instances to even contract for the most necessary public building without a prior levy and deposit of the funds in the public treasury. This the constitution never intended." What is there said is purely

dictum, as appears in numerous subsequent cases, to which we will call attention. In *Scott v. City of Davenport,* 34 Iowa, 208, the *Dively Case* is referred to, and it is there said: "The case of *Dively v. City of Cedar Falls,* 27 Iowa, 227, referred to by counsel for appellant, does not sustain their view. The court there decided that where a municipal corporation issued warrants or orders for the payment of money, directed to an officer of the same corporation, in an amount larger than 5 per cent. of the taxable property within the corporation, such issue of warrants was not a violation of the section of the constitution above set out, when the corporation had, at the same time, the means in its treasury to meet the warrants. In such case, the issue of the warrants amounted to no more than a direction by the corporation to its treasurer to pay out the money then in the treasury upon the warrants. The warrants were not obligations to pay money that the corporation expected to realize from property purchased. The cases are essentially different. In this case the issue of the bonds would create an indebtedness which the city would be bound to pay." We quote further from that case as follows: "It is only expected that at some future day the city will have the money to pay them (the bonds), derived from the revenues of the waterworks for which it is proposed to create this additional indebtedness. However reasonable this expectation may be, and however much the erection of the works may conduce to the safety of property and to the convenience or health of the people within the city, the constitution, the language of which seems too plain to be misunderstood, will not permit the creation of this additional debt for that or any other purpose." In *City of Council Bluffs v. Stewart, supra,* the effect of the anticipation of current revenues was considered, and we there said, "If the bonds in question should be issued upon the faith of the uncollected taxes and the levy for the current year, there is no power which could

prevent the city authorities from absorbing the taxes as-collected in payment of ordinary current expenses. Indeed, such a course might be absolutely necessary to maintain the city government. It is plain that, if bonds should be issued in anticipation of uncollected taxes, the constitutional limitation might, and probably would, be trans-cended." To these rules there are some exceptions. For instance, it is generally held that future revenues may be anticipated to meet contracts for current expenses. Such a rule, or rather exception, is absolutely necessary to the life of the city, and to the successful accomplishment of its purposes. In *Grant v. City of Davenport,* 36 Iowa, 396, this exception was applied, and it is there said: "Any appropriation of these revenues, therefore, whether by ordinance or by contract, to the payment of the ordinary expenses, would be, beyond question, as it seems to us, both reasonable and proper. And, if the appropriation was made in advance of the receipt of the revenues, the action would be just as legitimate, because that the revenues will be received is a legal certainty. * * * If, therefore, the ordinance in question accomplishes this, and no more, its validity is settled. But that a supply of pure water to the inhabitants of a city for their health and domestic use, as well as for the purpose of extinguishing fires, is the duty of a city, and that the cost thereof properly comes within the term 'ordinary expenses,' is not questioned by appellant's counsel; nor, indeed, could it be by any one. The city of Davenport would surely become indebted further by employing individuals or a corporation to construct its waterworks for it, in consideration of a certain sum, to be paid in bonds or other evidences of indebtedness. *Scott v. City of Davenport,* 34 Iowa, 208. And the necessity for the waterworks would constitute no justification or excuse for the violation of the constitution or of the statute. But if it can induce individuals or a corporation to construct and maintain such works for the use

and benefit of the municipality and its inhabitants, and
can pay a just and fair rent, as agreed, out of its current
revenues, and can also, out of such revenues, pay its other
ordinary expenses, we can see no sufficient reason for hold-
ing that an agreement to pay such rent, either weekly,
monthly, quarterly, or annually, creates an indebtedness
against the city. From these illustrations, as well as from
the plain and practical meaning of the language of the
constitutional inhibition, the true rule and just interpreta-
tion is evolved, to-wit, that where the contract made by
the municipal corporation pertains to its ordinary expenses,
and is, together with other like expenses, within the limit
of its current revenues and such special taxes as it may
legally and in good faith intend to levy therefor, such con-
tract does not constitute the incurring of indebtedness,
within the meaning of the constitutional provisions." In
*Water Co. v. Woodward,* 49 Iowa, 58, this language is
found relating to the subject now under consideration: "The
tax required to be levied is clearly authorized by the
statute, and such tax, together with the income of the com-
pany derived from other sources, the ordinance expressly
provides shall pay the obligations assumed by the city. If
it does not, neither the bondholders nor the company have
any claim on the city for the deficiency. The obligation
of the city is to levy the tax, and see that the amount col-
lected is applied to the specified purposes. If the special fund
legally provided is not sufficient, then it may be well said the
deficiency is not payable by the city, and it is difficult to
conceive that there can be such a thing as a debt which is
never to be paid. No burden is created thereby, and there
cannot be such an indebtedness. In any constitutional
sense, the prohibited indebtedness must be a burden, and
payable by the city from funds which could not constitu-
tionally be appropriated to that purpose. Whether the
fund legally provided will be sufficient for the designated
purpose we have no means of knowing. Nor is this regarded

as material, if no other charge is created on the city by the ordinance." In that case the city was also given the option to purchase the works, and of that it is said: "Now, the ordinance expressly provides that the city may purchase the works as soon as its financial condition will permit. But this provision cannot have the effect to create a present or future indebtedness, and, without serious doubt, was agreed upon in view of the present financial condition of the city. If, at some time in the future, the city can, without a violation of the constitution, purchase the works, and chooses to do so, we are unable to see that such a state of facts creates a present indebtedness, or that any obligation is now assumed by which a debt can be said to be created which is unconstitutional."

We think there is a radical distinction between a contract to procure light for a city and its inhabitants, and a contract for the construction of an electric light plant for a city, and the necessity for the plant constitutes no excuse or justification for the violation of the constitution. This distinction is pointed out in the *Grant Case, supra,* and is made plain in *Spilman v. City of Parkersburg,* 35 W. Va. 605 (14 S. E. Rep. 279). See, also, *Earles v. Wells,* 94 Wis. 285 (68 N. W. Rep. 964). Grant that the city had a right to levy a special assessment for the purpose of maintaining and operating an electric light plant, as provided by section 2 of chapter 11 of the Acts of the Twenty-second General Assembly, yet it does not follow that it could anticipate its future general revenues, for the purpose of erecting such a plant.

Again, it is argued that the contract does not create a debt, but merely a contractual obligation, which may only become a debt as the light was furnished and the compensation earned. It seems to be conceded that, if the contract related to the ordinary expenses of the city, as the furnishing of light or water, or of fire protection, this argument would be sound. Indeed, it is expressly so held in

many of the cases heretofore cited.   But does this rule apply to a contract for the construction of a plant for the purpose?   Expressions may be found in some of the cases cited that give color to this argument (see *Dively v. City of Cedar Falls, supra; Anderson v. Insurance Co.* 88 Iowa, 579; *Allen v. City of Davenport,* 107 Iowa, 90; *Water Co. v. Woodward,* 49 Iowa, 58); and in some cases this is no doubt the rule. See *City of East St. Louis v. East St. Louis Gaslight & Coke Co.* 98 Ill. 415; *Crowder v. Town of Sullivan,* 128 Ind. 486 (28 N. E. Rep. 94, 13 L. R. A. 647); *Smith v. Dedham,* 144 Mass. 177 (10 N. E. Rep. 782); *Lighting Co. v. City of Merrill,* 80 Wis. 358 (49 N. W. Rep. 965); *City of Walla Walla v. Walla Walla Water Co.* 172 U. S. 1 (19 Sup. Ct. Rep. 77, 43 L. Ed. 341).

But where the contract is for the erection of electric light plants, or for any other improvement, and the time of payment is postponed to a later date, and no special levy for the purpose of erecting such works is authorized, the rule seems to be well settled that the sums to become due in the future must all be taken into account in estimating the amount of the existing indebtedness of the municipality.   *Culbertson v. City of Fulton,* 127 Ill. 30, (18 N. E Rep. 781); *City of Council Bluffs v. Stewvrt, supra; French v. City of Burlington,* 42 Iowa, 614.

This must be the true rule, for, if appellants' contention be correct, the city might, by contracts such as the one in suit, absorb all the general revenues in advance, and leave nothing for the payment of current expenses.   Suppose a city should anticipate all its general revenues, and thus leave nothing for the payment of current expenses, and suppose, further, that it should issue warrants for the payment of these expenses, which were not paid for want of funds; could not the holder of these warrants enforce them against the city, and if enforced, and the city is compelled to pay (as no doubt it would be obliged to do) the

amount thereof, in addition to the amounts previously appropriated for improvements, would not the very object of the constitutional provision be thwarted, and a wise provision of our fundamental law rendered nugatory? The answer to these propositions is so obvious that no amount of refinement can add anything to the conclusion. We are cited to no case that establishes a contrary doctrine. Language is no doubt used in some of them which is broad enough to sustain appellants' contention, but that language must be interpreted in the light of the facts disclosed in the opinions. So interpreted, there is no real conflict in the cases on this proposition. As a general rule, a city may not anticipate its general revenues to be created by a scheme of general taxation. Special taxes and assessments may, however, be anticipated in a proper case. *Davis v. City of Des Moines,* 71 Iowa, 500; *City of Clinton v. Walliker,* 98 Iowa, 655; *Anderson v. Insurance Co., supra; Tuttle v. Polk,* 92 Iowa, 433; *Allen v. City of Davenport, supra.* As supporting the general rule announced, see, also *Read v. Atlantic City,* 49 N. J. Law, 558 (9 Atl. Rep. 759); *Beard v. City of Hopkinsville,* 95 Ky. 239 (24 S. W. Rep. 872, 44 Am. St. Rep. 222, 23 L. R. A. 402); *Spilman v. City of Parkersburg, supra; Prince v. City of Quincy,* 128 Ill. 443 (21 N. E. Rep. 768); *State v. Commissioners,* 37 Ohio St. 526. That such is the legislative intent is clearly indicated by section 1 of chapter 4 of the Acts of the Twenty-second General Assembly, which reads as follows: "All cities of the first class shall make their appropriation for all the different expenditures of the city government for each fiscal year at or before the beginning thereof, and it shall be unlawful for the city council or any officer, agent or employe of the city, to issue any warrant, enter into any contract, or appropriate any money in excess of the amounts thus appropriated, for the different expenses of the city, during the year for which said appropriation shall be made, and any such city shall not appropriate in the aggregate, an amount

in excess of its annual legally authorized revenue, but nothing herein shall prevent such cities from anticipating their revenues for the year for which such appropriation was made, or from bonding or refunding their outstanding indebtedness, provided, that this section shall not apply to cities of the first class organized since 1881." In construing this section, we said, in *Phillips v. Reed,* 107 Iowa, 331, that the object of the law was to place municipal corporations on a cash basis, and prevent the accumulation of such a floating indebtedness as appears in that case.

We do not overlook the fact that the city has the right to establish electric light plants, and to acquire a site therefor, and to pay for the same out of the general revenues. That fact is not regarded as controlling, however, for there is no authority to levy a special tax for either purpose.

Further, it is said on behalf of the city that it did not obligate itself to pay more under the contract for the plant and the expense of operating the same than it had theretofore been paying for lighting alone. We do not think this fact, even if true (and we doubt if it be established), is of controlling importance. It may have paid more for lighting than it should. But, however this may be, such situation does not authorize it to enter into a contract for the construction of a plant in violation of the constitutional inhibition.

We need not consider the obligation of the city to rebuild the plant in case of destruction by fire or otherwise. That such provision could not be enforced if, when time for performance arrived, the city was indebted to the constitutional limit, is too clear for argument.

As the contract for the purchase of the site is conditional on the main contract being held valid, there is no necessity for considering the legality of the contract made with the trustees of the Sibley estate.

Careful consideration of the authorities cited, aided by patient independent examination of the questions

involved, leads to the conclusion that the contracts in suit, as well as the tax levied pursuant thereto, are invalid, and that the decree of the district court is right.—AFFIRMED.

GRANGER, C. J., not sitting.