John T. RICHARDS et al., Appellants,

v.

CITY OF MUSCATINE, Iowa, Appellee.

No. 2–58012.

Supreme Court of Iowa.

Nov. 12, 1975.

Rosenberger, Petersen & Conway, Muscatine, for appellants.

Eckhardt, Goedken, Hintermeister & Ryan, Muscatine, and Herrick, Langdon, Belin, Harris, Langdon & Helmick, Des Moines, for appellee.

UHLENHOPP, Justice.

In this appeal we pass upon the validity of the tax increment plan for urban renewal which the legislature authorized in §§ 403.9 and 403.19 of the Iowa Code.

Chapter 403 of the Code, the urban renewal law, empowers Iowa cities to take specified steps "to eliminate slums and prevent the development or spread of slums and urban blight and to encourage needed urban rehabilitation. . . ." § 403.3. In 1969, the General Assembly amended the urban renewal law to provide a new method of financing urban renewal projects; it added § 403.19 to allow a city to allocate to a special fund the increment in state, city, county, school, and other taxing district taxes resulting from the increase in valuation of an urban renewal area brought about by an urban renewal project. 63 G.A. ch. 237, § 2. In addition, the General Assembly amended § 403.9 to provide for the payment of urban renewal bonds out of the tax increment fund. *Id.* § 1. The portions of amended § 403.9 relevant to our inquiry provide:

1. A municipality shall have power to periodically issue bonds in its discretion to pay the cost of carrying out the purposes and provisions of this chapter, including, but not limited to, the payment of principal and interest upon any advances for surveys and planning, and the payment of interest on bonds, herein authorized, not to exceed three years from the date the bonds are issued. The municipality shall have power to issue refunding bonds for the payment or retirement of such bonds previously issued by it. Said bonds shall be payable solely from the income and proceeds of the fund and portion of taxes referred to in subsection two of section two (2) of this Act, and revenues and other funds of the municipality derived from or held in connection with the undertaking and carrying out of urban renewal projects under this chapter. The municipality may pledge to the payment of the bonds the fund and portion of taxes referred to in subsection two (2) of section two (2) of this Act, and may further secure the bonds by a pledge of any loan, grant or contribution from the federal government or other source in aid of any urban renewal projects of the municipality under this chapter, or by a mortgage of any such urban renewal projects, or any part thereof, title which is vested in the municipality.

2. Bonds issued under this section shall not constitute an indebtedness within the meaning of any constitutional or statutory debt limitation or restriction, and shall not be subject to the provisions of any other law or charter relating to the authorization, issuance or sale of bonds. Bonds issued under the provisions of this chapter are declared to be issued for an essential public and governmental purpose and, together with interest thereon and income therefrom, shall be exempted from all taxes.

3. Bonds issued under this section shall be authorized by resolution or ordinance of the local governing body and may be issued in one or more series and shall bear such date or dates, be payable upon demand or mature at such time or times, bear interest at such rate or rates not exceeding seven per centum per annum, be in such denomination or denominations, be in such form either coupon or registered, carry such conversion or regis-

tration privileges, have such rank or priority, be executed in such manner, be payable in such medium of payment, at such place or places, and be subject to such terms of redemption, with or without premium, be secured in such manner, and have such other characteristics, as may be provided by such resolution or trust indenture or mortgage issued pursuant thereto.

4. Such bonds may be sold at not less than par at public or private sale, or may be exchanged for other bonds on the basis of par.

Section 403.19 provides:

A municipality may provide by ordinance that taxes levied on taxable property in an urban renewal project each year by or for the benefit of the state, city or town, county, school district, or other taxing district after the effective date of such ordinance, shall be divided as follows:

1. That portion of the taxes which would be produced by the rate at which the tax is levied each year by or for each of the taxing districts upon the total sum of the assessed value of the taxable property in the urban renewal project, as shown on the assessment roll used in connection with the taxation of property by the taxing district, last equalized prior to the effective date of the ordinance, or the assessment roll last equalized prior to the date of initial adoption of the urban renewal plan in the case of projects commenced prior to July 1, 1972, shall be allocated to and when collected be paid into the fund for the respective taxing district as taxes by or for said taxing district into which all other property taxes are paid. For the purpose of allocating taxes levied by or for any taxing district which did not include the territory in an urban renewal project on the effective date of the ordinance or initial adoption of the plan, but to which the territory has been annexed or otherwise included after the effective date, the assessment roll of the county last equalized on the effective date of the ordinance or initial adoption of the plan shall be used in determining the assessed valuation of the taxable property in the project on the effective date.

2. That portion of the taxes each year in excess of such amount shall be allocated to and when collected be paid into a special fund of the municipality to pay the principal of and interest on loans, moneys advanced to, or indebtedness, whether funded, refunded, assumed, or otherwise, including bonds issued under the authority of section 403.9, subsection 1, incurred by the municipality to finance or refinance, in whole or in part, the redevelopment project, except that taxes for the payment of bonds and interest of each taxing district must be collected against all taxable property within the taxing district without limitation by the provisions of this subsection. Unless and until the total assessed valuation of the taxable property in an urban renewal project exceeds the total assessed value of the taxable property in such project as shown by the last equalized assessment roll referred to in subsection 1 of this section, all of the taxes levied and collected upon the taxable property in the urban renewal project shall be paid into the funds for the respective taxing districts as taxes by or for said taxing districts in the same manner as all other property taxes. When such loans, advances, indebtedness, and bonds, if any, and interest thereon, have been paid, all moneys thereafter received from taxes upon the taxable property in such urban renewal project shall be paid into the funds for the respective taxing districts in the same manner as taxes on all other property.

3. The portion of taxes mentioned in subsection two (2) of this section and the special fund into which they shall be paid, may be irrevocably pledged by a municipality for the payment of the principal and interest on loans, advances, bonds issued under the authority of section four

hundred three point nine (403.9), subsection one (1) of the Code, or indebtedness, incurred by a municipality to finance or refinance, in whole or in part, the urban renewal project.

4. As used in this section the word "taxes" includes, but is not limited to, all levies on an ad valorem basis upon land or real property.

On July 18, 1974, acting under chapter 403 of the Code, the City of Muscatine, Iowa, adopted Resolution 74067 which approved an urban renewal plan for a one-block downtown area as Urban Renewal Project No. 2. (The present litigation does not involve Muscatine's Project No. 1, which was federally funded.) The plan called for acquisition and clearance of this area and redevelopment into a multi-story office building. Also on that date, Muscatine adopted Ordinance 74070 which directed the division and allocation of the taxes levied on the property within Project No. 2 in the manner provided by § 403.19. On August 15, 1974, Muscatine adopted Resolution No. 74185 which authorized issuance under § 403.9 of $800,000 of urban renewal bonds, to be paid from the tax increment fund created by Ordinance 74070.

On October 1, 1974, plaintiffs commenced the present action for a declaration that the resolutions, the ordinance, and §§ 403.9 and 403.19 of the Code are invalid. On February 5, 1975, the trial court upheld the validity of the resolutions, ordinance, and sections in all respects. Plaintiffs appealed and in this court attack the validity of §§ 403.9 and 403.19 and Muscatine's actions thereunder on a number of grounds. We consider the grounds in a different order than plaintiffs present them.

I. *Procedural Due Process.* In divisions I and IX of their brief, plaintiffs argue that §§ 403.9 and 403.19 are unconstitutional in failing to require the city to give to the various other affected taxing districts, and the property owners therein, notice and opportunity to be heard prior to the city's decision to proceed under § 403.9 and § 403.19.

■ Plaintiffs appear to be correct that chapter 403 does not provide for notice and hearing prior to a city's taking action to divide tax revenue under § 403.19 or to issue bonds under § 403.9. Section 403.5(3), with which Muscatine complied, does state, "The local governing body shall hold a public hearing on an urban renewal project after public notice thereof by publication . . . ." Section 403.17(10), however, defines "urban renewal project" as "includ[ing] undertakings and activities of a municipality *in an urban renewal area*" and lists such activities within the urban renewal area as acquisition of a slum area, demolition of buildings, and construction of improvements. (Italics added.) The issuance of bonds, and the division of tax revenues to provide a fund to finance them, do not seem to come within this definition of "urban renewal project," and are therefore not within the notice and hearing requirement of § 403.5(3).

■ In addition, while § 408A.1 of the Code, in force at the time of these proceedings but later repealed, required notice to be published before a city could issue bonds greater than a specified amount, § 403.9(2) specifically provides that "Bonds issued under this section . . . shall not be subject to the provisions of any other law or charter relating to the authorization, issuance or sale of bonds." Thus § 403.9 superseded § 408A.1 insofar as urban renewal bonds are concerned. Hence the city was not required by chapter 403 or other statute to give notice and a hearing before adopting the resolutions or ordinance.

Plaintiffs contend that §§ 403.9 and 403.-19 and Muscatine's actions thereunder therefore violate the due process clauses of § 9 of article 1 of the Iowa Constitution and of the Fourteenth Amendment to the United States Constitution. In considering plaintiffs' due process contention, we do not decide whether a statutory notice and hearing requirement would be advisable but rather, whether due process mandates notice and hearing.

Plaintiffs' contention requires us to consider the difference between adjudicative and legislative facts. These two types of facts are distinguished thus in 1 K. Davis, Administrative Law Treatise, § 7.02 at 413 (1958):

> Adjudicative facts usually answer the questions of who did what, where, when, how, why, with what motive or intent. . . . Legislative facts do not usually concern the immediate parties but are general facts which help the tribunal decide questions of law and policy and discretion.

Due process frequently requires notice and hearing when the proceeding involves adjudicative facts. E. g. *Roznos v. Town of Slater,* 254 Iowa 77, 86, 116 N.W.2d 471, 476. The rule as to legislative facts is different:

> [T]he law continues to be unclear and vague concerning minimum procedural requirements with respect to issues of legislative facts. But because the Supreme Court itself frequently resolves such issues without a trial type hearing, we may be sure that due process often falls short of requiring the trial method for the determination of all such issues. 1 K. Davis, supra, § 7.06 at 429.

This court held in accord with Professor Davis's view in *Stanley v. Southwestern Community College Merged Area,* 184 N.W.2d 29 (Iowa). There the residents, voters, and taxpayers of a community college merged area argued that in failing to provide for a hearing on objections to the formation of the merged area, the relevant statute did not afford due process. This court responded, "Creation of a school district is a legislative function. . . . There is no constitutional requirement for a hearing under the facts of this case." 184 N.W.2d at 36.

■ Similarly, Muscatine's decisions to issue bonds under § 403.9 and to finance them under § 403.19 were legislative in character. The relevant facts involved general questions of policy and discretion.

Muscatine was no more required to give the public notice and opportunity for a hearing than the Iowa legislature must do so when it considers a bill. The trial court correctly held against plaintiffs on this issue.

II. *Improper Delegation of Legislative Power.* Section 1 of article III of the Iowa Constitution, under the heading Legislative Department, states in part, "The Legislative authority of this State shall be vested in a General Assembly, which shall consist of a Senate and House of Representatives . . . ." Plaintiffs make several claims that in §§ 403.9 and 403.19 the legislature unconstitutionally attempted to delegate its legislative authority to the cities of Iowa. Plaintiffs argue in divisions II and XVII of their brief that §§ 403.9 and 403.19 fail to establish adequate procedures and guidelines for implementation by cities, and in particular in division XI that by those sections the legislature unconstitutionally attempted to delegate its power to tax. Plaintiffs also find unconstitutional attempts to delegate power in the provisions of § 403.9(2) and § 403.9(4) for the private sale of urban renewal bonds free of the requirements of any other law regulating the issuance of municipal bonds (divisions XVIII, XXIX); in the grant of authority in § 403.9(1) to mortgage urban renewal property to which a city holds title (division XX); and in the failure of § 403.9(1) to provide specific procedures for refunding urban renewal bonds (divisions XXII and XXIII).

■ We are clear that § 403.19 does not entail an unconstitutional delegation of legislative authority. In that section, the legislature prescribed the procedure in detail for the division and allocation of taxes. Little is left to the discretion of the city. Under these circumstances no unconstitutional delegation of legislative authority exists. *Webster Realty Co. v. City of Fort Dodge,* 174 N.W.2d 413, 417 (Iowa).

On the other hand, § 403.9 does give municipalities some discretion in the issuance of urban renewal bonds, although it

prescribes a program. Is that section therefore invalid? We think not for two reasons.

First, in its previous decision under chapter 403, this court considered a general charge that chapter 403 constitutes an unconstitutional delegation of legislative authority and in rejecting the attack stated, "A detailed program for the issuance of bonds is set out at section 403.9. . . ." *Webster Realty Co. v. City of Fort Dodge,* 174 N.W.2d 413, 417 (Iowa).

■ Second, the General Assembly may confer upon political subdivisions the power to legislate on matters of local concern. The court expounded this doctrine in *Koelling v. Board of Trustees,* 259 Iowa 1185, 1190–1191, 146 N.W.2d 284, 287–288. See also *State ex rel. Howe v. Mayor of Des Moines,* 103 Iowa 76, 82, 72 N.W. 639, 641; 16 Am.Jur.2d Constitutional Law § 251 at 501–502. We do not now define the parameters of the doctrine. We hold that the issuance of urban renewal bonds is a matter of local concern and within the doctrine.

■ We need not consider whether Muscatine has power to do what it is doing simply by virtue of the Home Rule Amendment, § 40, article III, Iowa Constitution. Sections 403.9 and 403.19 do exist, and the legislature may confer powers such as these upon cities even if the powers go beyond the Home Rule Amendment. *Sampson v. City of Cedar Falls,* 231 N.W.2d 609 (Iowa); *Green v. City of Cascade,* 231 N.W.2d 882 (Iowa); *McGrory v. City of Cascade,* 232 N.W.2d 262 (Iowa).

■ We hold that §§ 403.19 and 403.9 do not unconstitutionally delegate legislative power.

III. *Substantive Due Process.* Plaintiffs claim that §§ 403.9 and 403.19, and Muscatine's resolutions and ordinance, deprive them of property without due process of law. Iowa Const. art. 1, § 9; U.S.Const. Amend. XIV, § 1.

■ Here as elsewhere on their claims of unconstitutionality, plaintiffs have a heavy burden. "It is a well-settled rule that one who attacks a statute on constitutional grounds must negate every reasonable basis upon which it could be sustained. . . . [T]he provisions of amendment 14 . . . do not prohibit the state from exercising its police power to pass and enforce laws as will benefit the health, morals, and general welfare of the people." *Green v. Shama,* 217 N.W.2d 547, 553, 554 (Iowa). We must uphold §§ 403.9 and 403.19 unless we can say no rational basis exists for believing that those sections further the public health, safety, morality, and general welfare. *Williamson v. Lee Optical Co.,* 348 U.S. 483, 487–488, 75 S.Ct. 461, 464, 99 L.Ed. 563, 572; *North Dakota State Board of Pharmacy v. Snyder's Drug Stores, Inc.,* 414 U.S. 156, 94 S.Ct. 407, 38 L.Ed.2d 379.

■ A. In divisions IV and X of their brief, plaintiffs argue that by reducing the amount of property which would otherwise be taxable to meet the general expenses of the various taxing districts involved, § 403.19 increases the taxes of the property owners of those districts and reduces the ability of the taxing districts other than the city to raise revenue and incur indebtedness—all of which, plaintiffs say, amounts to deprivation of property without due process of law. We place the last of these claims aside—that § 403.19 reduces the ability of other taxing districts to incur indebtedness—as contrary to the plain language of § 403.19(2) ("taxes for the payment of bonds and interest of each taxing district must be collected against all taxable property within the taxing district without limitation by the provisions of this subsection").

An argument can be made that no tax increment would exist had Muscatine not created the urban renewal project—so that the urban renewal project itself does not deprive any person or district of property. Yet the real issue is whether the allocation of taxes under § 403.19 deprives any person or district of property without due process *with the urban renewal project carried out.* Viewed in this light, plaintiffs may be cor-

rect that § 403.19 deprives them and affected taxing districts of property. But are they right that such deprivation is without "due process"?

The tax increment scheme in § 403.19 is extraordinary. The various taxing districts will levy taxes for particular purposes—such as a levy of two mills by the county for court expenses in a given year just ahead. That levy will be imposed on the increased value (as well as on the frozen value) of the developed urban renewal property. But the taxes collected from that levy on the increased value will not be used for court expenses for which they were levied, but rather for urban renewal bond principal and interest—as though the city had made the levy for such purpose.

We can readily see that individuals of good will might differ about the wisdom of the scheme. But the wisdom of legislation is not for us to decide. We must confine our inquiry to whether the legislation lacks a rational basis. *Sampson v. Cedar Falls,* 231 N.W.2d 609 (Iowa).

Urban renewal itself serves a valid public purpose and relates to the general welfare. *Webster Realty Co.,* supra, 174 N.W.2d at 416; Anno. 44 A.L.R.2d 1414, 1420. The tax increment plan appears to be a feasible method of financing such projects. It is more advantageous to the city than ordinary general obligation bonds, since the plan places the direct burden on the urban renewal property. We cannot say that the tax division scheme in § 403.19 is without a rational basis.

B. In divisions XVIII and XIX, plaintiffs argue that no rational basis exists for the provisions of § 403.9 which allow the periodic sale of urban renewal bonds (§ 403.9(1)) and which exempt the issuance of such bonds from the statutes which normally regulate the sale of municipal bonds (§ 403.9(2)). We think, however, the General Assembly could rationally conclude that extraordinary flexibility is necessary in the marketing of these new and unusual bonds.

See *Green v. City of Mt. Pleasant,* 256 Iowa 1184, 1220, 131 N.W.2d 5, 28.

C. In divisions XIII, XVI, XXV, and XXVI, plaintiffs argue (1) that "freezing" the assessed value of the urban renewal property under Muscatine's resolutions and ordinance could continue even after the urban renewal bonds have been fully paid and (2) that the freeze could continue indefinitely because of the unlimited refunding provisions of § 403.9. Plaintiffs assert that these sections are therefore unconstitutional.

The last sentence of § 403.19(2) refutes plaintiffs' first argument: "When such loans, advances, indebtedness, and bonds, if any, and interest thereon, have been paid, all moneys thereafter received from taxes upon the taxable property in such urban renewal project shall be paid into the funds for the respective taxing districts in the same manner as taxes on all other property." Once original and refunding bonds under § 403.9 are paid, the tax division under § 403.19 ceases.

On the other hand, plaintiffs appear correct that the refunding provision of § 403.9(1) has no time limit, so that such refunding under that subsection and freezing under § 403.19 could go on indefinitely. But we do not think this means those refunding provisions are without a rational basis. Cf. § 419.6 of the Code (perpetual refunding of industrial revenue bonds). Such a refunding provision gives flexibility to the financing of an urban renewal project; it may permit the city to save interest through timely redemption and refunding.

Plaintiffs suggest that the city will let the interest-bearing bonds stand out longer than necessary. We question that this is so. The tax allocation of § 403.19 holds back from the city revenues which would otherwise be available for other uses just as it holds back revenues from other taxing districts involved. We cannot hold that the refunding provision of § 403.9 has no rational basis.

In connection with their division XXVI, plaintiffs apparently assume that the provision of § 403.9(1) which allows capitalization of interest "not to exceed three years from the date the bonds are issued" permits the issuance of *refunding* bonds which would capitalize interest for a period beyond the three-year period from original issuance of bonds—three more years of interest could be capitalized when the bonds are refunded. The Muscatine city administrator testified in similar vein that if Muscatine does not complete the urban renewal project within three years from the issuance of temporary bonds, resulting in the exhaustion of the interest reserve account created by the capitalization in the temporary bonds of three years' interest, the city would default on the interest payments and "pick up those additional costs when the temporary bonds are refunded into a permanent bond issue."

We do not agree with this interpretation of § 403.9(1). The legislature clearly intended to limit the capitalization of interest to three years from the beginning of the project and contemplated payment of interest thereafter from the tax increment fund. To allow a city to capitalize three years' interest in original bonds and then to capitalize three more years' interest when the bonds are refunded would frustrate legislative intent.

IV. *Improper Classification.* In several divisions of their brief, plaintiffs assert that §§ 403.9 and 403.19, and Muscatine's resolutions and ordinance, entail unconstitutional discrimination. Plaintiffs rely on several constitutional sections.

A. Uniform Operation of the Law; Special Privileges. Section 6 of article I of the Iowa Constitution states, "All laws of a general nature shall have a uniform operation; the General Assembly shall not grant to any citizen, or class of citizens, privileges or immunities, which, upon the same terms shall not equally belong to all citizens."

(1) In divisions VI and VIII of their brief, plaintiffs argue that allocation of taxes under § 403.19 violates the quoted constitutional section because the allocation uses tax revenues to enable the urban renewal developer to obtain property at a cost lower than he would otherwise have to pay.

Plaintiffs' argument is contrary to the rationale of *Webster Realty Co. v. City of Ft. Dodge,* 174 N.W.2d 413 (Iowa). There the plaintiff claimed that chapter 403 gave special privileges to those who lived in the urban renewal area. This court rejected the claim, saying the fact that one class incidentally benefits more than another does not "destroy the public character of urban renewal or make it vulnerable to the attack that it is a special privilege law." 174 N.W.2d at 416.

Another decision contrary to plaintiffs' position is *Green v. City of Mt. Pleasant,* 256 Iowa 1184, 1199, 131 N.W.2d 5, 15. There the plaintiff claimed that a statute authorizing a city to construct and lease industrial plants and to issue bonds to finance such projects violated § 6 of article 1 because it permitted persons engaged in manufacturing, processing, or assembling agricultural or manufactured products to borrow money at a lower rate than persons not qualifying under the act. This court found no violation of the constitution even though the statute benefited some members of the community more than others.

The leading case construing § 6 of article I is *Dickinson v. Porter,* 240 Iowa 393, 35 N.W.2d 66. This court there upheld a statute which gave a property tax credit to the owners of agricultural land in school districts where the millage for the general school fund exceeded 15 mills. In doing so the court stated, "If there is any reasonable ground for the classifications in this law and it operates equally upon all within the same class, there is uniformity in the constitutional sense and no violation of [§ 6 of article I]." 240 Iowa at 400, 35 N.W.2d at 72. See also *Lee Enterprises, Inc. v. Iowa State Tax Comm'n,* 162 N.W.2d 730, 753 (Iowa).

We think a reasonable ground and a public purpose exist for any special benefits § 403.19 incidentally creates. The legislature must have thought—and we cannot say without reason—that urban renewal benefits a city, not just a developer. As this court said in *Dickinson,* "A law may serve the public interest although it benefits certain individuals or classes more than others." 240 Iowa at 416, 35 N.W.2d at 80.

In arguing that § 403.19 results in lack of uniformity in the operation of laws of a general nature, plaintiffs rely upon Wisconsin cases. Section 1 of article VIII of the Wisconsin Constitution states, "The rule of taxation shall be uniform." The Wisconsin Supreme Court held that this provision permits only one class of property in the taxation of real estate and prohibits partial exemptions for certain types of property. *Ehrlich v. City of Racine,* 26 Wis.2d 352, 132 N.W.2d 489. Plaintiffs in the instant case argue § 403.19 creates a partial exemption and we should follow *Ehrlich* and hold § 403.19 invalid on that basis.

We decline to do so. First, § 403.19 can hardly be said to create a partial exemption for the urban renewal developer. He will pay taxes at the same rate as everyone else; § 403.19 only affects the use of taxes after collection.

Second, even if § 403.19 could be said to create a partial exemption, it would not necessarily violate our constitutional requirement of uniform operation of the laws. As we have indicated, this court's interpretation of § 6 of article I is quite different from the Wisconsin court's interpretation of its somewhat dissimilar section. Contrast *Dickinson v. Porter,* 240 Iowa 393, 35 N.W.2d 66, with *Gottlieb v. City of Milwaukee,* 33 Wis.2d 408, 147 N.W.2d 633.

We hold that a reasonable ground exists for the classification created by § 403.19 and that the section operates equally upon all within the class. Section 6 of article I requires no more. The trial court properly rejected plaintiffs' claim in divisions VI and VIII.

(2) In division XIV plaintiffs argue that § 403.19 creates an independent taxing district and unconstitutionally grants special privileges to owners of real estate within that district—the urban renewal area. A taxing district is a "district throughout which a particular tax or assessment is ratably apportioned and levied upon the inhabitants." Black's Law Dictionary (4th Ed.).

We do not think that the urban renewal area is made an independent taxing district by § 403.19. That section merely allocates the taxes which are levied by the existing taxing districts. The property in the project area is valued in the same manner and pays the same millage of tax as other property. We reject plaintiffs' claim in division XIV.

(3) In division XV of their brief, plaintiffs argue that § 403.19 invalidly purports to authorize Muscatine to allocate the taxes on real estate not included within an actual urban renewal area. For example, plaintiffs say, a city could under § 403.19 establish a large urban renewal area, freeze the property tax valuation of the whole area, and then redevelop only a small portion of it. Plaintiffs assert § 403.19 therefore violates the prohibition against special privileges in § 6 of article I.

We do not think § 403.19 would allow a city to do what plaintiffs fear it would. First, § 403.19 only allows the division of taxes "levied on taxable property *in an urban renewal project . . . .*" (Italics added.) An "urban renewal project" is defined by § 403.17(10) as including "undertakings and activities of a municipality in an urban renewal area" such as acquisition of a slum area, demolition of buildings, construction of streets, parks, and other improvements, and disposition of any acquired property by sale or lease. Each of these is an *activity* which is of direct benefit to the immediately surrounding area. The legislation contains no suggestion that the General Assembly intended "urban re-

newal project" to encompass a territory which a city merely designates as an urban renewal area but redevelops only in small part.

Second, the apparent purpose of § 403.19 —enabling payment of urban renewal bonds out of the tax increment brought about by the project itself—leads to the same conclusion. That section does not appear to contemplate applying a valuation freeze to areas not actually being redeveloped.

■ We thus find that § 403.19 can be applied to freeze the tax valuation only in areas being physically redeveloped by an urban renewal project. We have no occasion to decide whether plaintiffs' argument of discrimination would be good even if we construed § 403.19 as broadly as they suggest.

■ B. Local or Special Laws. The first clause of § 30 of article III of the Iowa Constitution states, "The General Assembly shall not pass local or special laws in the following cases: For the assessment and collection of taxes for State, County, or road purposes . . . ." In division VI, plaintiffs argue that § 403.19 constitutes a "special law" in violation of § 30 in that § 403.19 uses tax revenues to enable a developer to obtain urban renewal property at a lower cost. We assume arguendo that the quoted clause applies to cities.

This court has said of § 30 of article III as well as of § 6 of article I, "If there is any reasonable ground for the classifications in this law and it operates equally upon all within the same class, there is . . . no violation of [§ 30 of article III]." *Dickinson v. Porter,* supra, 240 Iowa at 400, 35 N.W.2d at 72. We have already concluded that a reasonable basis exists for the classification in § 403.19. We find no invalidity here.

■ C. Appropriations for Private Purposes. In divisions VI and XII plaintiffs argue that § 403.19, by benefiting the developer and causing other taxpayers to carry a greater share of the general costs of government, violates § 31 of article III of the Iowa Constitution, which states in part that "no public money or property shall be appropriated for local, or private purposes, unless such appropriation, compensation, or claim, be allowed by two-thirds of the members elected to each branch of the General Assembly." We again assume arguendo that the quoted clause applies to cities.

In order to prevail on their claim, plaintiffs must show "there is an absence of all possible public interest in the purposes for which the appropriation here is used. . . ." *Dickinson v. Porter,* supra, 240 Iowa at 418, 35 N.W.2d at 81. The appropriation in question is the allocation of the tax increment fund to the payment of urban renewal bonds. We have held that urban renewal itself serves a legitimate public purpose, *Webster Realty Co. v. City of Ford Dodge,* 174 N.W.2d 413, 416 (Iowa), and we thus reject plaintiffs' claim that § 403.19 violates § 31 of article III.

D. Equal Protection. As their final argument concerning improper classification, plaintiffs assert that §§ 403.9 and 403.19 deny equal protection of the laws in several ways. U.S.Const. Amend. XIV, § 1.

■ If a classification is not based upon race, sex, alienage, or national origin and does not involve a fundamental right, it must be sustained "unless it is patently arbitrary and bears no rational relationship to a legitimate governmental interest." *Lunday v. Vogelmann,* 213 N.W.2d 904, 907 (Iowa). See also *United States Department of Agriculture v. Moreno,* 413 U.S. 528, 533, 93 S.Ct. 2821, 2825, 37 L.Ed.2d 782, 787; *State v. Books,* 225 N.W.2d 322, 324 (Iowa).

■ (1) In division VII in their brief, plaintiffs argue that the allocation of taxes under § 403.19 denies them equal protection because it causes property owners such as plaintiffs to pay a greater share of the general costs of government than the project developer. Section 403.19 does cause the developer to pay a proportionately smaller amount to the general funds of

the local taxing districts than owners of other property pay. We have already indicated, however, that the classification of § 403.19 has a rational relationship to the legitimate governmental purpose of having the urban renewal project pay for itself, in a sense, rather than spreading the cost throughout the city. We therefore reject plaintiffs' argument.

(2) In division XXVIII, plaintiffs appear to argue that Muscatine's resolutions and ordinance are void because they pledge to payment of the bonds the income from sales of the property in the urban renewal project "including income derived from the sale of a portion of the real estate located in Urban Renewal Project No. 2 which is not being developed." Plaintiffs seem to believe that a sale of property not intended to be developed would constitute improper discrimination.

As we have already indicated, we are unable to perceive how these provisions are discriminatory in a constitutional sense. We thus reject plaintiffs' argument.

(3) In division XXX of their brief, plaintiffs argue that § 403.9(2), by exempting urban renewal bonds and the interest thereon from taxation, denies equal protection of the laws to holders of other types of municipal bonds.

The legislature has exempted various kinds of obligations and the interest thereon from state taxation. See Code 1975, § 262.51 (Board of Regents self-liquidating facilities bonds), § 262A.8 (state university buildings, facilities, and services revenue bonds), § 346A.4 (county health center bonds). The ultimate question, of course, is whether this tax exemption is rationally related to a legitimate governmental purpose. We believe it is. The legislature could consider the exemption proper in order to make these unusual bonds, with their restricted security, more attractive to investors. We hold therefore that the tax exemption of § 403.9(2) does not deny equal protection.

V. *Lending the State's Credit.* In division III, plaintiffs assert that issuing tax increment bonds under § 403.9 lends the credit of the state, because part of the city's taxes are pledged to the payment of the bonds. Plaintiffs say this violates § 1 of article VII of the Iowa Constitution. The pertinent part of § 1 states, "The credit of the State shall not, in any manner, be given or loaned to, or in aid of, any individual, association, or corporation  . . .." Here again we assume arguendo that the constitutional section applies to cities.

One of the principal cases interpreting this section of our constitution is *Grout v. Kendall,* 195 Iowa 467, 473, 192 N.W. 529, 531. The court there said:

It was to remove [the] delusion of suretyship with its snare of temptation, that this section of the Constitution was adopted. It withheld from the constituted authorities of the state *all power or function of suretyship.* It forbade the incurring of obligations by the indirect method of secondary liability. This is the field and the full scope of this section. It does not purport to deal with the creation of a primary indebtedness for any purpose whatever.

In line with this principle, the court in another case refused to apply the section to invalidate a statute reimbursing utility companies for relocation costs occasioned by the construction of interstate highways; the statute involved only a "primary obligation" of the state. *Edge v. Brice,* 253 Iowa 710, 716, 113 N.W.2d 755, 758.

In the instant case, similarly, Muscatine acts as a surety for no one when it issues urban renewal bonds. Its liability is primary. Section 1 of article VII has no application.

VI. *Impairment of the Obligation of Contracts.* Plaintiffs assert that §§ 403.9 and 403.19 impair the obligation of contracts contrary to § 21 of article I of the Iowa Constitution and § 10 of Article I of the United States Constitution.

■ Plaintiffs first argue, in division V of their brief, that the allocation of taxes by § 403.19 impairs Muscatine's contractual obligation to repay its general obligation bonds already outstanding, because § 403.19 reduces the city's ability to meet its obligations under those bonds.

Plaintiffs appear to misread § 403.19. Subsection 2 of that section makes an exception to the division of taxes otherwise provided: "[T]axes for the payment of bonds and interest of each taxing district must be collected against all taxable property within the taxing district without limitation by the provisions of this subsection." Section 403.19 will not reduce the ability of Muscatine or the other taxing districts to meet the obligations of their outstanding bonds. We thus reject plaintiffs' division V. We have no occasion to say what the result would be absent the exception in § 403.19(2).

■ Second, in division XXVII plaintiffs assert that Muscatine's resolutions and ordinance are invalid because they authorize the issuance of additional bonds payable from the same fund and ranking on a parity with the original bonds of $800,000. Plaintiffs say that the issuance of the additional bonds would impair the city's obligation to the holders of the original bonds.

Section 8 of Resolution 74185 does indeed reserve to the city the right to issue additional bonds payable from the same fund and ranking on a parity with the original bonds. But we do not believe that the issuance of additional bonds would impair the city's obligation under the original bonds. Section 2 of the resolution sets forth the form of the proposed original bonds. That form explicitly refers to Resolution 74185 "for a more complete statement as to . . . the rights of the holders of such bonds. . . ." Muscatine's right to issue additional bonds is thus part of its contract with the original bondholders; by exercising this right Muscatine would in no way impair the obligation under the original bonds. We reject plaintiffs' division XXVII.

■ VII. *Public Policy.* In division XXI, plaintiffs attack the proposal of the city, expressed in § 9 of Resolution 74185, to sell the land in the urban renewal project subject to a covenant running with the land which would require the landowner to construct such improvements on the land as will maintain the tax increment fund at a level sufficient to pay the interest and principal of the bonds issued under § 403.9. Plaintiffs ask us to hold such covenant invalid as contrary to public policy.

Section 403.8(1) of the Code authorizes cities to sell urban renewal land "subject to such covenants, conditions and restrictions, including covenants running with the land, as it may deem to be necessary or desirable to . . . carry out the purposes of this chapter." The covenant proposed by defendant can reasonably be deemed desirable to carry out the purposes of chapter 403, since it increases the security of the urban renewal bonds. The covenant is therefore within § 403.8(1). Since the covenant comes within the statute, plaintiffs are essentially attacking the policy of the statute. But "[i]t is not the province of courts to pass upon the policy, wisdom or advisability of a statute; they are questions for the legislature." *Estate of Brauch v. Beeck,* 181 N.W.2d 132, 134 (Iowa). See also *Keasling v. Thompson,* 217 N.W.2d 687, 690 (Iowa).

VIII. *Constitutional Debt Limitation.* Section 3 of article XI of the Iowa Constitution states, "No county, or other political or municipal corporation shall be allowed to become indebted in any manner, or for any purpose, to an amount, in the aggregate, exceeding five per centum on the value of the taxable property within such county or corporation—to be ascertained by the last State and county tax lists, previous to the incurring of such indebtedness." In division XXIV plaintiffs assert that Muscatine's Resolution 74185 is invalid because the city thereby resolves to issue an amount of urban renewal bonds which is in excess of the constitutional limitation.

Muscatine presently is indebted to such an extent that it can incur only $700,000 of additional debt and remain within the constitutional limitation. If the proposed urban renewal bonds of $800,000 would create an indebtedness within the meaning of § 3 of article XI, Muscatine's debt would exceed the limitation by $100,000. Hence the issue is whether the urban renewal bonds would create an indebtedness by Muscatine within the meaning of § 3.

In arguing that the bonds issued under § 403.9 are not a constitutional "debt", Muscatine stresses the provisions of § 403.9(1) and (2) that the bonds will be payable solely from the revenues of the urban renewal project itself including the tax increment fund and that the bonds will not constitute a general obligation of the city. Muscatine points out, correctly, that bonds payable solely out of a fund created by a special assessment do not create a "debt" within the meaning of § 3, *Davis v. City of Des Moines*, 71 Iowa 500, 32 N.W. 470, and that bonds payable solely from revenues of a municipal enterprise are not debts within the constitutional section. *Goreham v. Des Moines Metropolitan Area Solid Waste Agency*, 179 N.W.2d 449, 457 (Iowa); *Interstate Power Co. v. Town of McGregor*, 230 Iowa 42, 54, 296 N.W. 770, 776; *Wyatt v. Town of Manning*, 217 Iowa 929, 250 N.W. 141. Muscatine argues that because it will not be liable generally on the urban renewal bonds, the special assessment and revenue bond cases require a holding that the urban renewal bonds do not create a constitutional debt.

■ The purpose of § 3, as indicated by the special assessment and revenue bond cases, is to prevent the general taxes of a political subdivision from becoming overburdened by obligations. The taxes which will be used to pay the proposed urban renewal bonds and interest will be general taxes. This is not a case of a special assessment tax which was never intended to be used, and could not be used, to meet other expenses of the city. Nor is this a case where the bonds are to be paid from the operating revenues of a municipal enterprise which generates income, such as a power plant.

■ Ultimately the "credit" of a city is its power to levy general taxes. When it pledges all or part of that power, it pledges its credit and in a realistic sense incurs an obligation. We think the bonds must realistically be treated as a debt for the purposes of § 3.

Clearly the urban renewal bonds would constitute a constitutional debt if they were payable from the general revenues of the city without limitation. We think the result is not different because § 403.19 carves out a certain portion of a city's general revenues and limits the liability of the city to those revenues. If the result were otherwise, a city could divide its general revenues into several special funds, each with a bond issue restricted to recourse against its own fund—and thus commit large portions of the city's revenues without regard to § 3. The constitutional debt limitation could thus be virtually nullified.

The decisions of this court and of other courts support the conclusion that these urban renewal bonds are a constitutional debt. Plaintiffs would have us return to the reasoning of *Swanson v. City of Ottumwa*, 118 Iowa 161, 91 N.W. 1048. *Swanson* involved a special two-mill tax levied by Ottumwa on all property in the city to pay for a waterworks. Ottumwa levied a five-mill tax in addition to pay maintenance and operation costs and any part of the purchase price not covered by the two-mill tax. Bonds to be issued for the project were payable solely out of the fund created by those two taxes, and not out of the city's general revenues. This court held that because no judgment could be rendered against the city on the bonds and the bonds could not be enforced against the city's general assets, the bonds did not create debt within § 3.

The reasoning of *Swanson* would strongly support plaintiffs if it were still law.

Shortly after this court decided *Swanson*, however, the United States Eighth Circuit Court of Appeals reached the opposite result on parallel facts. *City of Ottumwa v. City Water Supply Co.,* 119 F. 315. Thereafter this court overruled *Swanson in Brunk v. City of Des Moines,* 228 Iowa 287, 301, 291 N.W. 395, 400. In *Brunk,* the municipal bonds were again solely payable out of a fund created by the levy of a special tax. This court held that the bonds constituted an indebtedness within the meaning of the constitution.

*Brunk* is in accord with the earlier case of *Windsor v. City of Des Moines,* 110 Iowa 175, 81 N.W. 476. In *Windsor,* the city contracted to levy a special tax in the future to pay for an electric plant. The contract stated that the city would have no obligation other than to levy and collect the special tax. This court ruled that a debt existed within the constitutional limitation, saying, "This must be the true rule, for, if appellants' contention be correct, the city might, by contracts such as the one in suit, absorb all the general revenues in advance, and leave nothing for the payment of current expenses." 110 Iowa at 193, 81 N.W. at 482.

The *Brunk* and *Windsor* decisions find support in a number of cases from other states. In a California decision, municipal bonds to build a harbor were to be repaid solely from operating revenues, revenues from oil deposits in the city's tidelands, and that part of the sales, use, and license tax revenues from the harbor area attributable to the additional business activity occasioned by the project. *City of Redondo Beach v. Taxpayers, Property Owners, Citizens and Electors of the City of Redondo Beach,* 54 Cal.2d 126, 5 Cal.Rptr. 10, 352 P.2d 170. Because part of the special fund was made up of general tax revenues, the California Supreme Court held the bonds to be a debt within the California constitutional debt limitation clause.

A similar decision is *Taxpayers and Citizens of the Town of Georgiana v. Town of Georgiana,* 265 Ala. 654, 93 So.2d 493. A town levied a special tax on gross business receipts and certain warrants were made payable solely from the resulting tax fund. The Alabama Supreme Court held that the warrants created a debt. The court quoted 1 J. Dillon, Municipal Corporations, § 198 at 370 (5th Ed.):

> If the fund from which the obligations are to be paid is to be created by the levy of a tax under the general power of taxation vested in the municipality, although the contract stipulates that no general indebtedness for the stipulated amount shall be created against the city, and that the only obligation undertaken by the city is to levy, anticipate, and pledge the tax agreed to be imposed, indebtedness is created. . . .

Other authorities taking this position include *City of Oxnard v. Dale,* 45 Cal.2d 729, 290 P.2d 859; *Village of East Moline v. Pope,* 224 Ill. 386, 79 N.E. 587; *Opinion of the Justices,* 231 A.2d 431 (Me.); *Laverents v. City of Cheyenne,* 67 Wyo. 187, 203, 217 P.2d 877, 882; 15 McQuillin, Municipal Corporations, § 41.31 at 364 (1970). Contra, *Switzer v. City of Phoenix,* 86 Ariz. 121, 341 P.2d 427.

Plaintiffs are right that under § 403.19, a city does not earmark a portion of *millage of tax* for the payment of bonds, as the city did in *Brunk.* But the amount of tax collected is ascertained by two factors: millage of tax and value of property. (Millage is converted to dollars per thousand, under 65 G.A., ch. 1231.) Section 403.19 earmarks a portion of *value of property* for the payment of bonds. Earmarking either a portion of millage or a portion of value accomplishes the same result—a portion of the city's general tax revenues are set aside. Earmarking either way thus falls within the rationale of the *Brunk* decision.

We are not persuaded that we should overrule the *Brunk* case and go back to the reasoning of the *Swanson* decision. We hold therefore that the urban renewal bonds which defendant proposes to issue

would constitute a debt of Muscatine within the meaning of § 3 of article XI. The trial court erred in holding to the contrary.

We do not believe, however, that Resolution 74185 is totally void. If a municipal contract rather than a resolution were involved, it would be void only to the extent that the debt it created exceeded the constitutional limitation. *Trepp v. Independent School District of Pocahontas,* 213 Iowa 944, 240 N.W. 247; *McPherson v. Foster Brothers,* 43 Iowa 48. Resolution 74185 is thus valid to an amount of bonds which, with Muscatine's other indebtedness, comes within 5% of the value of the taxable property within the city. Cf. *F. H. Uelner Precision Tools & Dies, Inc. v. City of Dubuque,* 190 N.W.2d 465 (Iowa).

We have examined all the claims plaintiffs make. We agree with the trial court's denial of those claims with one exception. We reverse the holding that the proposed urban renewal bonds will not create a debt within the constitutional limitation.

Appeal costs three-fourths to plaintiffs and one-fourth to Muscatine.

Affirmed in part, reversed in part.

All Justices concur.